**IN THE UNITED STATES DISTRICT COURT** F I L E D
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**    01 FEB 22 AM 8: 37

U.S. DISTRICT COURT
N.D. OF ALABAMA

Dr. Jonathan Griffiths; Griffith's Chiropractic )
Care, P.C.; Dr. J. Matthew Youngblood; )
Youngblood Chiropractic, P.C.; Dr. Ronald F. )
Ivie; Ivie Chiropractic Clinic; Dr. J. Robert )
Hollis, Jr.; J. Robert Hollis, Jr., D.C., P.C.; )
Dr. M. Burton Anderson; Anderson )
Chiropractic Clinic; Dr. Jody S. Gray; Gray )
Chiropractic Center; Dr. Peter DeFranco; )
Hueytown Chiropractic Clinic, LLC; Dr. Carl )
Nelson; Nelson Chiropractic Clinic; )
Dr. Kevin Palmer; Palmer Chiropractic Clinic; )
Dr. Jerry S. Kirby; and Kirby Chiropractic )
Clinic, )
 )
                         Plaintiffs, )
 )
vs. )                                  CV-01-BU-0471-S     ___
 )
Blue Cross and Blue Shield of Alabama, )
 )
                         Defendant. )

## C O M P L A I N T

Come plaintiffs, Dr. Jonathan Griffiths; Griffiths Chiropractic Care, P.C.; Dr. J. Matthew

Youngblood; Youngblood Chiropractic, P.C.; Dr. Ronald F. Ivie; Ivie Chiropractic Clinic; Dr.

Robert Hollis, Jr.; J. Robert Hollis, Jr., D.C., P.C.; Dr. M. Burton Anderson; Anderson Chiropractic

Clinic; Dr. Jody S. Gray; Gray Chiropractic Center; Dr. Peter DeFranco; Hueytown Chiropractic

Clinic, LLC; Dr. Carl Nelson; Nelson Chiropractic Clinic;  Dr. Kevin Palmer; Palmer Chiropractic

Clinic;  Dr. Jerry Kirby; and Kirby Chiropractic Clinic seek damages from and injunctive relief

against Blue Cross and Blue Shield of Alabama ("Blue Cross"), and allege, based upon their own

knowledge with respect to the actions of Blue Cross, and upon information and belief with respect

to all other matters, as follows:

## NATURE OF THE ACTION

1. Plaintiffs are doctors of chiropractic and chiropractic clinics who bring this action to recover compensatory and punitive damages and costs, including attorneys' fees, for defendant's wrongful conduct as more fully described below, and to obtain equitable relief enjoining defendant from engaging in wrongful acts that, among other things,

      (a)    wrongfully discriminate against chiropractors by such actions as:

            1.   arbitrarily and without reasonable justification establishing severely restrictive benefit limits for chiropractic services;

            2. reimbursing chiropractors at a much lower rate than the reimbursements paid to other providers for comparable services;

            3. bundling and down coding services provided by chiropractors and reimbursing chiropractors the lowest benefit payment possible for only one of the services;

            4. establishing higher deductibles with lower limits on benefits offered by chiropractors than for other providers offering comparable services;

            5. establishing such high deductibles and low benefit limits for chiropractors, that the "benefit" is not really a benefit at all;

            6. eliminating coverage for given services by chiropractors while allowing other providers to be reimbursed for services for which chiropractors are licensed in the State of Alabama;

            7. refusing to provide benefits for diagnostic testing when ordered by a chiropractor;

            8. wrongfully, arbitrarily and capriciously denying reimbursements to chiropractors for chiropractic services;

      (b)    unreasonably restrict access to doctors of chiropractic by impeding, delaying, or discouraging persons covered by Blue Cross plans from seeking treatment by doctors of chiropractic;

(c)     unconscionably deny compensation or permit inadequate compensation for doctors of chiropractic for medically necessary services rendered by these physicians to patients covered by medical health benefits plans sold or administered by Blue Cross;

(d)     direct persons covered by medical health benefits plans offered or administered by Blue Cross away from chiropractors and toward other providers, including hospital based physical therapists, by unconscionably setting the terms and the extent of coverage of services provided;

(e)     unconscionably impose conditions for covered chiropractic treatment that are incompatible with accepted chiropractic practices; and

(f)     utilize pre-certification requirements to deny benefits for medically necessary treatment provided to patients even in emergency situations when pre-certification is neither feasible nor possible because of the actions of defendant.

## JURISDICTION AND VENUE

2.  This action is brought to recover damages caused by reason of and for injunctive relief against, the violations of defendant as alleged in detail below, of §§ 1 and 2 of the Sherman Act, 15 U.S.C., §§ 1 and 2, the Alabama Anti-Trust Statutes (Ala. Code § 6-5-60 and 8-10-1 *et seq.*), and other common law violations.

3.  This Court has subject matter jurisdiction over these claims under §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, under principles of federal question jurisdiction pursuant to 28 U.S.C. § 1331, and under principles of supplemental jurisdiction pursuant to 28 U.S.C. §§ 1367.

4.  Venue is proper in the Northern District of Alabama because Blue Cross maintains an office, has agents, transacts business, resides, and is found within this district all within the meaning of 15 U.S.C. §§ 15 and 22 and 28 U.S.C. §§1391 (b) and (c).

## THE PARTIES

5.  Plaintiff Jonathan Griffiths is a chiropractor who is licensed to practice chiropractic in the

3

State of Alabama and who has, at all times pertinent to this Complaint, been a licensed chiropractor treating patients in the State of Alabama. Dr. Griffith's office is located at 5290 Old Springville Road, Suite 106. Pinson, Alabama 35126

6. Plaintiff Griffiths Chiropractic Care, P.C., is the chiropractic clinic operated by Dr. Jonathan Griffiths located at 5290 Old Springville Road, Suite 106, Pinson, Alabama 35126.

7. Plaintiff J. Matthew Youngblood is a chiropractor who is licensed to practice chiropractic in the State of Alabama and who has, at all times pertinent to this Complaint, been a licensed chiropractor treating patients in the State of Alabama. Dr. Youngblood's office is located at 260 South Cody Road, Mobile, Alabama 36695.

8. Plaintiff Youngblood Chiropractic, P.C., is the chiropractic clinic operated by Dr. J. Matthew Youngblood located at 260 South Cody Road, Mobile, Alabama 36695.

9. Plaintiff Dr. Ronald F. Ivie is a chiropractor who is licensed to practice chiropractic in the State of Alabama and who has, at all times pertinent to this Complaint, been a licensed chiropractor treating patients in the State of Alabama. Dr. Ivie's office is located at 1830 Montclair Road, Birmingham, Alabama 35210.

10. Ivie Chiropractic Clinic is the chiropractic clinic operated by Dr. Ronald F. Ivie located at 1830 Montclair Road, Birmingham, Alabama 35210.

11. Plaintiff Dr. J. Robert Hollis, Jr. is a chiropractor who is licensed to practice chiropractic in the State of Alabama and who has, at all times pertinent to this Complaint, been a licensed chiropractor treating patients in the State of Alabama. Dr. Hollis's office is located at 7201 Copperfield Drive, Montgomery, Alabama 36117.

12. Plaintiff J. Robert Hollis, Jr., D.C., P.C., is the chiropractic clinic operated by Dr. J.

4

Robert Hollis, Jr., located at 7201 Copperfield Drive, Montgomery, Alabama 36117.

13. Plaintiff Dr. M. Burton Anderson is a chiropractor who is licensed to practice chiropractic in the State of Alabama and who has, at all times pertinent to this Complaint, been a licensed chiropractor treating patients in the State of Alabama. Dr. Anderson's office is located at 215 West College Street, Florence, Alabama 35630.

14. Plaintiff Anderson Chiropractic Clinic is the chiropractic clinic operated by Dr. M. Burton Anderson located at 215 West College Street, Florence, Alabama 35630.

15. Plaintiff Dr. Jody S. Gray is a chiropractor who is licensed to practice chiropractic in the State of Alabama and who has, at all times pertinent to this Complaint, been a licensed chiropractor treating patients in the State of Alabama. Dr. Gray's office is located at 4329 Main Street, Pinson, Alabama 35126.

16. Plaintiff Gray Chiropractic Center is the chiropractic clinic operated by Dr. Jody S. Gray at 4329 Main Street, Pinson, Alabama 35126.

17. Plaintiff Dr. Peter DeFranco is a chiropractor who is licensed to practice chiropractic in the State of Alabama and who has, at all times pertinent to this Complaint, been a licensed chiropractor treating patients in the State of Alabama. Dr. DeFranco's office is located at 3166 Allison-Bonnett Road, Hueytown, Alabama 35023.

18. Plaintiff Hueytown Chiropractic Clinic, LLC, is the chiropractic clinic operated by Dr. Peter DeFranco located at 3166 Allison-Bonnett Road, Hueytown, Alabama 35023.

19. Dr. Carl Nelson is a chiropractor who is licensed to practice chiropractic in the State of Alabama and who has, at all times pertinent to this Complaint, been a licensed chiropractor treating patients in the State of Alabama. Dr. Nelson's office is located at 947 South 3 Notch Street,

5

Andalusia, Alabama 36420.

20. Plaintiff Nelson Chiropractic Clinic is the chiropractic clinic operated by Dr. Carl Nelson located at 947 South 3 Notch Street, Andalusia, Alabama 35420.

21. Plaintiff Dr. Kevin Palmer is a chiropractor who is licensed to practice chiropractic in the State of Alabama and who has, at all times pertinent to this Complaint, been a licensed chiropractor treating patients in the State of Alabama. Dr. Palmer's office is located at 43431 Highway 195, Haleyville, Alabama 35565.

22. Plaintiff Palmer Chiropractic Clinic, is the chiropractic clinic operated by Dr. Kevin Palmer located at 43431 Highway 195, Haleyville, Alabama 35565.

23. Plaintiff Dr. Jerry S. Kirby is a chiropractor who is licensed to practice chiropractic in the State of Alabama and who has, at all times pertinent to this Complaint, been a licensed chiropractor treating patients in the State of Alabama. Dr. Kirby's office is located at 6148 Atlanta Highway, Montgomery, Alabama 36117.

24. Plaintiff Kirby Chiropractic Clinic is the chiropractic clinic operated by Dr. Jerry S. Kirby located at 6148 Atlanta Highway, Montgomery, Alabama 36117.

25. Defendant Blue Cross is an Alabama non-profit organization with its principle place of business in Birmingham, Alabama. Blue Cross is a special purpose corporation, organized under § 10-4-100, *et seq*. of the Alabama Code (1975) to maintain a healthcare service plan for subscribers. Blue Cross is reported to provide and/or administer health benefits plans for over 70% of Alabama's insured residents. Blue Cross therefore controls the market for the provision and/or administration of non-governmental health benefit plans throughout Alabama. Because of its market strength, Blue Cross, by having monopolistic control of the payment to providers for medical health benefit services

6

rendered by the providers, is able to dictate not only the terms of compensation to providers such as chiropractors, but the access, if any, to treatment by licensed doctors of chiropractic to persons covered by health care plans sold or administered by Blue Cross.

## CONCERTED ACTION

26. Blue Cross has acted in concerted action with HealthSouth, the leading provider of physical therapist services in the State of Alabama. Blue Cross benefits in various ways from its relationship with HealthSouth, including by being designated and paid to serve as the administrator for the employee benefit plan that HealthSouth has for its employees in many parts of the country. Blue Cross has also coerced various hospitals, physicians, and/or x-ray and diagnostic clinics not named as defendants in the Complaint to participate in or otherwise perform acts in furtherance of certain of the violations committed by Blue Cross as alleged in this Complaint.

27. Blue Cross is paid to serve as the nationwide Medicare Fiscal Intermediary for HealthSouth – which is the nation's largest provider of physical therapy throughout the country. The Health Care Finance Administration ("HCFA") made this designation at the request of HealthSouth and with the consent agreement of Blue Cross.

28. In addition to the significant period of time during which Blue Cross made money from HealthSouth by serving as the administrator for the employee benefit plan for HealthSouth throughout much of the United States, in approximately October 2000, Blue Cross announced that HealthSouth will no longer be self-insured. Rather, Blue Cross is now the insurer for all of HealthSouth's employee health insurance policies nationwide. This agreement will expand Blue Cross's private insurance business tremendously, making HealthSouth one of Blue Cross's largest single customers.

7

29. Plaintiffs allege based on information and belief that in return for the substantial payments that Blue Cross receives from HealthSouth, it has agreed to pay HealthSouth more for the physical therapy services HealthSouth provides and to direct business away from the plaintiffs to HealthSouth and others similarly situated.

## INTERSTATE COMMERCE

30. Blue Cross and the various hospitals, physicians, x-ray and diagnostic clinics that have contracted with Blue Cross have utilized banking facilities and purchased substantial quantities of goods and services outside the State of Alabama for use in providing medical coverage and medical services to patients within the State of Alabama.

31. Various hospitals and physicians, including the chiropractors herein, who contract with Blue Cross regularly attract and provide medical services to out-of-state patients.

32. Many companies in the market for the provision and administration of health benefit plans are national in scope but operate and transact business across state lines.

33. Many corporate employers remit across state lines substantial premium payments for underwriting or administering Blue Cross health benefits plans for their employees.

34. Plaintiffs have in the past treated and continue to treat patients from states outside of the State of Alabama.

35. Blue Cross's actions that are the subject of this complaint have been within the flow of, and have substantially affected, interstate trade and commerce.

## RELEVANT MARKETS

36. Relevant markets affected by Blue Cross's conduct are (i) the market for the provision of reimbursement for private medical health services; and (ii) the market for chiropractic services

8

(collectively, the "relevant product markets"). The relevant geographic market for purposes of this action is the State of Alabama.

## BACKGROUND

37. Chiropractic is a licensed health care profession in the State of Alabama, as well as in every other state in the nation. Chiropractic is defined in Ala. Code § 34-24-120(a), as "the science and art of locating and removing without the use of drugs or surgery any interference with the transmission and expression of nerve energy in the human body by any means or methods as taught in schools or colleges of chiropractic . . . ." Chiropractic is concerned mostly with the nerves, muscles, skeleton, and the neuromuscular system in general. Chiropractics locate and remove, without the use of drugs or surgery, any interference with the transmission and expression of nerve energy in the human body by recognized and acceptable chiropractic means. Licensed chiropractors in Alabama may examine, analyze and diagnose the human body and its diseases by the use of any physical, clinical, thermal or radonic method, the use of X-ray diagnosing, and may use any other general method of examination for diagnosis and analysis taught in recognized schools of chiropractic. Ala. Code § 34-24-120(b).

38. Blue Cross is the dominant medical health benefits provider in Alabama, reportedly providing and/or administering health benefits plans for over 70% of Alabama's insured residents. As a necessary component of its business of providing and/or administering medical health benefits plans to millions of subscribers in Alabama, Blue Cross contracts with numerous health care providers, including Doctors of Chiropractic, to provide chiropractic care to Blue Cross's subscribers pursuant to a standard form contract prepared by Blue Cross. Given its enormous market strength, Blue Cross is in a position to dictate to providers the terms and conditions under which it will

9

payments for services rendered.  As more fully described below, Blue Cross has utilized its strength and power to act in a discriminatory, anti-competitive, arbitrary, and capricious  manner to the detriment of the Plaintiffs herein.

39. In 1995, Blue Cross developed the "Participating Chiropractor Program" ("PCP"), which was a Blue Cross program designed and promoted to (i) further the interests of the public in obtaining chiropractic care in the least costly method consistent with a patient's condition; (ii) achieve the objectives of both the participating chiropractors and Blue Cross to provide chiropractic care at lesser costs;  (iii) encourage plan members to utilize chiropractors participating in the Blue Cross program while preserving to them the right to choose any chiropractor; and (iv) pay chiropractors participating in the program on a fee-for-service basis for medically necessary services that are appropriate to the needs of the plan members for chiropractic care.  See Participating Chiropractor Agreement ("Agreement") at ¶2.3, attached to this Complaint as Exh. "A."

40. Chiropractors desiring to participate in the PCP were required to submit an application to Blue Cross.  If accepted, the applicant chiropractor would be bound by the terms of the Agreement.  The stated object of the Agreement was the "prospective financing of benefits of chiropractic care at a lower cost to the public for chiropractic services that both are medically necessary and are provided in the least costly setting and method consistent with the needs of patients for chiropractic care. "Exh. A," at ¶ 1.3

41. The PCP initially was created for employees of the State of Alabama Plan ("Employees' Plan").  The Employees' Plan was a self funded plant with a chiropractic benefits package which included an 18 visit, medical necessity review point with no annual limits  The Employees' Plan had no deductible and a specific co-pay provision.  As part of its marketing effort to attract chiropractors,

10

including plaintiffs, to join the PCP, Blue Cross, through its agent and representative Eddie Harris among others, advised certain chiropractors, including plaintiffs Dr. Griffiths and Dr. Kirby, that if the Employees' Plan actually achieved a reduction in overall benefits paid to PCP chiropractors, then the PCP chiropractic benefits package would be extended to medical health benefits plans sold or administered by Blue Cross other than the Employees' Plan. Mr. Harris advised Dr. Griffiths and Dr. Kirby, among others, that Blue Cross would evaluate the Employees' Plan after one year after which, assuming the PCP was successful (meaning that the PCP resulted in a reduction in the amount of chiropractic benefits paid under the Employees' Plan), then Blue Cross would aggressively market the program to other employer groups. Dr. Griffiths and Dr. Kirby believed these representations and, in reliance upon these representations, aggressively marketed and encouraged fellow chiropractors, including the remaining plaintiffs, to join the Blue Cross PCP. Dr. Griffiths and Dr. Kirby even held informational seminars around the state to promote the PCP to their chiropractic colleagues, including the remaining plaintiffs. Some of those seminars were attended by Mr. Harris of Blue Cross. Mr. Harris assured Dr. Griffiths and Dr. Kirby, among others, that when Blue Cross expanded the PCP to employer groups other than the Employees' Plan, there would not be a reduction in benefits offered for chiropractic services and there would be no benefits limitation other than the 18 visit medical necessity review point which the Employees' Plan provided. Blue Cross, through the representations of Mr. Harris, intentionally and knowingly, or recklessly without knowledge or regard for the consequences, falsely led the plaintiffs as well as other chiropractors throughout the State, into believing that signing the Employees' Plan was tantamount to the signing of the PCP contract. Plaintiffs believed these representations and acted in reliance thereon. These representations were false at the time they were made, and defendant knew

11

they were false at the time they were made, or Blue Cross recklessly and without regard for the consequences made the representations with the intent that the plaintiffs should rely on them at the time they were made. Plaintiffs did rely on them and have been damaged as a consequence of that reliance and are continuing to the present time to be damaged as a consequence of defendant's actions.

42. In 1996, approximately one year after the PCP with the Employees' Plan began, Dr. Griffiths and Dr. Kirby, among others, met with William Ashmore (of the Employees' Plan) and certain Blue Cross employees including Blue Cross marketing representative Mark Midyette. At that meeting, Mr. Ashmore reported that the Employees' Plan had enjoyed a 12% to 14% cost reduction in overall chiropractic payments over the one year period since this PCP began. Notwithstanding the earlier representations of Blue Cross that signing the Employees' Plan was tantamount to signing the PCP, and that Blue Cross would aggressively market to its employer groups the chiropractor's benefit package in the Employees' Plan, Blue Cross, through Mr. Midyette, then attempted to persuade Mr. Ashmore to reduce chiropractic benefits to 12 visits or less per year. Fortunately, Drs. Kirby and Griffith were able to persuade Mr. Ashmore not to reduce the chiropractic benefits in the Employees' Plan. In retrospect, this discussion is indicative of the manipulative, malicious and deceptive manner in which Blue Cross induced chiropractors in general, and the plaintiffs in particular, to join the PCP.

43. Having fraudulently induced plaintiffs and chiropractors to join the PCP by promising plaintiffs and other chiropractors that it would market and promote a benefits package like the Employees' Plan chiropractor benefits package to employer groups throughout the State, Blue Cross began aggressively marketing to other employer groups medical health benefits plans that offered

12

benefits dramatically lower than those in the Employees' Plan. This marketing strategy is ongoing and continues at the present time. Blue Cross, however, has maintained and maintains at the present time, that it only reduces chiropractic benefits in group medical health benefits plans at the specific request of an employer group. Blue Cross's representations concerning its efforts to promote benefits comparable to those in the Employees' Plan are false and were falsely made with knowledge by Blue Cross that they were untrue at the time they were made and/or were made recklessly without knowledge of the truth and/or without regard for the consequences, with the intent that plaintiffs would rely on them, and plaintiffs did rely on them to their detriment. Blue Cross's fraud in this regard is ongoing, and continues at the present time. Upon information and belief, Blue Cross today is aggressively marketing group benefit plans with severely reduced chiropractic benefits such as with $200 to $400 annual benefit limits with a $200 deductible, or group benefit plans with no chiropractic benefits at all. Upon information and belief, plaintiffs believe that Blue Cross does not even give employer groups the option to select more enhanced benefits. Further, it is plaintiffs' understanding that Blue Cross will not expand chiropractic coverage for employer group plan evens when asked to do so by the employer group.

44. Chiropractic care has been demonstrated, even under Blue Cross studies, to be far less expensive than alternative comparable services. Notwithstanding the greater cost savings that directing patients toward chiropractors would yield, Blue Cross nonetheless has demonstrated a discriminatory and anti-competitive bias against chiropractors by severely restricting benefits, or eliminating benefits altogether, in an effort to discourage or deny patients access to chiropractic care and to deny to chiropractors the right to provide medically necessary chiropractic treatment for their patients. In comparison, particularly given its relationship with Health South and the physical

13

therapists at Health South, Blue Cross reimburses Health South substantially more for hospital based physical therapy services then it pays to chiropractors rendering the same or similar services.

45. Blue Cross has demonstrated its discriminatory and anti-competitive treatment of chiropractic coverage by failing to reimburse adequately for recognized medically necessary chiropractic services. The Participating Chiropractor Agreement requires doctors of chiropractic to accept as reimbursement for services rendered amounts determined by Blue Cross as full payment for their services. Blue Cross has utilized this power to exploit chiropractors, including the plaintiffs, by imposing predatory and punitively low reimbursements, or no reimbursements at all, for the services of doctors of chiropractic. The American Medical Association (an organization of medical physicians) has developed and published Physicians' Current Professions Terminology ("CPT") codes for use in identifying healthcare services. Blue Cross utilizes the CPT codes by requiring health care providers to submit requests for payment using CPT codes to identify the services for which payment is requested. In determining the actual fee to be paid for the particular procedure, Blue Cross utilizes the Resource Based Relative Value Scale (RBRVS), HCFA's official payment methodology for physician services provided to Medicare patients. Under RBRVS, Relative Value Units (RVUs) are determined based on human resources and other costs associated with the delivery of a specific procedure or service. Every procedure or service (as defined by the CPT codes) has a unit value assigned to it by the RBRVS. The value associated with a CPT code is based on the skill, training, and equipment required to provide the treatment represented by the particular CPT code. The intention behind the RBRVS is to establish a consistent, rational basis for assessing the resources that go into providing any physician service.

46. As part of its discriminatory practice towards plaintiffs, Blue Cross has unilaterally,

14

arbitrarily, and capriciously determined that it will not pay to chiropractors the fee established by the RVU for particular services, even though it will pay to other providers the RVU for the same procedure. Rather, Blue Cross has unilaterally, arbitrarily, and capriciously determined that on certain procedures, doctors of chiropractic will be reimbursed at a much lower level than hospital based physical therapists, particularly those at HealthSouth facilities, notwithstanding that the professions are delivering comparable services, but the physical therapists do not have doctoral status as do the plaintiffs. This policy by Blue Cross allows Blue Cross to direct and/or encourage persons covered by medical benefits plans offered or administered by Blue Cross to seek treatment from health care providers favored by Blue Cross (i.e., the hospital based physical therapists, including at out-patient facilities of HealthSouth) and to discourage those persons from seeking treatment by health care providers who are disfavored by Blue Cross (i.e., doctors of chiropractic).

47. In 1997, the American Medical Associated implemented new CPT codes for chiropractic manipulation therapy ("CMT"), with code numbers 98940, 98941, 98942 and 98943. Blue Cross unilaterally, arbitrarily, and capriciously determined that it would reimburse doctors of chiropractic only for the lowest code possible, regardless of the level of service actually performed. Even worse, the reimbursement rate of Blue Cross was based on a Blue Cross "administrative decision," rather than by utilization of the RVU values, which are the values upon which all other procedures reimbursed by Blue Cross are based. Blue Cross unilaterally, arbitrarily, and capriciously refuses to separately reimburse chiropractors for ""evaluation and management" E/M codes and a "spinal manipulation" (98940) code on the same visit, even when the services rendered are medically necessary and indicated for the appropriate treatment of the patient (according the American Medical Associations's own CPT coding division). Further, Blue Cross has a demonstrated practice

15

of bundling, down coding, and/or otherwise wrongfully denying reimbursement for therapeutic services incurred on the same visit and reimbursing only for the lowest payment code for chiropractic manipulative care at any particular visit. Indeed, Blue Cross has consistently valued the CMT codes at a reduced value scale in comparison with "like services" which are outlined in the CPT code manuals. Prior to the 1997 implementation of the CMT codes, code number 97260 code was used to describe chiropractic manipulation, which by CPT definition described only the "work" component of the code. Even though the 1997 CMT codes included all of the components and values of the codes, Blue Cross nonetheless unilaterally, arbitrarily, and capriciously chose to continue to reimburse at the same level which had been appropriate for a code with an RVU of 0.42 even though the code for which reimbursement was sought had an RVU value at 0.75, almost twice the reimbursable value. Further, Blue Cross has instructed chiropractors not to use certain codes in the CPT manual notwithstanding the fact that chiropractors are authorized by statute and law to do so under the proper auspices of their appropriate state license.

48. In response to the many complaints raised by the chiropractors, in approximately 1995, Joe Bolen, Blue Cross Vice President, Provider Services, established the Chiropractic Liaison Committee, the alleged purpose of which was to facilitate and improve relations between participating chiropractors and Blue Cross and to effectuate change in the conduct and actions of Blue Cross toward the chiropractors. Both Blue Cross representatives and practicing chiropractors were named to the committee. Mr. Bolen initially named Eddie Harris as chairman of this committee. Subsequently, Raymond Rainey and then Jeff Ingram, both Provider Services representatives, chaired this committee. Currently, David Arrington, Provider Relations, is chairman of the committee. The chairs of this committee report directly to Mr. Bolen. Plaintiffs are informed

16

and believe that Mr. Bolen, Mr. Harris, Mr. Rainey, Mr. Ingram and/or Mr. Arrington, and perhaps other representatives of Blue Cross, agreed between themselves at the time the committee was formed and continue to the present to agree between themselves that this committee was to have no real force and effect, and that the committee was established merely to appease members of the chiropractic profession, including plaintiffs, and not with the intent that the committee would ever effectuate any change in the conduct and actions of Blue Cross. Members of the chiropractic profession, including plaintiffs, embraced this committee as an indication of Blue Cross's good faith and desire to work together with doctors of chiropractic to resolve differences between the two parties. Plaintiffs believed the representations of Blue Cross at the time the committee was formed, and long after the formation of the committee as to the purposes and goals of the committee. Plaintiffs were fraudulently induced by the statements and actions of Blue Cross and its representatives, and by the establishment of the committee itself, into believing that the best vehicle for effectuating the changes in Blue Cross's conduct toward doctors of chiropractic was through this committee. Over time, it has become apparent to plaintiffs that this committee is and always was a committee in name only, established by Joe Bolen, Eddie Harris, and others at Blue Cross, for the sole purpose of continuing to deceive the PCP chiropractors, and plaintiffs in particular, into believing that Blue Cross was genuinely concerned about and receptive to the particular needs and issues raised by members of the chiropractic profession, and that Blue Cross was interested in and willing to effectuate changes in its unfair, discriminatory, anti-competitive, unequal and disparate treatment of the chiropractic profession. Plaintiffs assert that at no time has Mr. Bolen, Mr. Rainey, Mr. Ingram, Mr. Arrington, Assistant Medical Director Dr. William Hansford, and/or Blue Cross intended for this committee to serve any function other than to nominally appease the

17

chiropractic profession, and these plaintiffs in particular, and lure them into the false and erroneous belief that the many complaints and problems that plaintiffs and other chiropractors have had with the conduct and actions of Blue Cross were in the process of being resolved by Blue Cross in good faith. Such actions and misrepresentations by Blue Cross were deceitful and fraudulent, and were made intentionally and knowingly, and/or recklessly without regard for the truth and the consequences of the representations, with the intent at the time they were made that plaintiffs and other chiropractors should rely on them, and plaintiffs and other chiropractors did rely on them and as a consequence have been and are continuing to be damaged.

49. Blue Cross has utilized its market strength to injure doctors of chiropractic, and particularly these plaintiffs, in numerous additional ways, all of which have served to damage these plaintiffs and to restrict and restrain them from the pursuit of their chosen profession. Blue Cross's illegal anti-competitive and discriminatory practices have diminished the chiropractic profession, and these plaintiffs in particular, both financially and in the patient care market. Blue Cross has utilized pre-certification requirements in group benefits plans to either refuse reimbursement for treatment or direct patients away from chiropractors, and the plaintiffs herein, by discouraging primary care medical physicians from referring patients to chiropractors and by imposing such unreasonable requirements on pre-certification that a doctor of chiropractic cannot obtain reimbursement for medically necessary services rendered to a patient in an emergency situation when pre-certification is neither possible nor feasible. Such actions by Blue Cross are arbitrary, capricious, and without reasonable justification, and are done with the intent to injure and damage the chiropractic profession, and the plaintiffs herein in particular, with the result that they have in fact injured and damaged the chiropractic profession and these plaintiffs in particular.

18

50. Doctors of Chiropractic are now reimbursed at a rate that is substantially less than the rate of compensation received by hospital based physical therapists who do not have doctoral status, particularly those at HealthSouth facilities. This practice and policy allows Blue Cross to direct and/or encourage persons covered by medical health benefits plans offered or administered by Blue Cross to seek treatment from health care providers favored by Blue Cross and to discourage those persons from seeking treatment by health care providers who are disfavored by Blue Cross (i.e., doctors of chiropractic), all to the detriment of chiropractors in general, and the plaintiffs herein in particular.

## COUNT I

## SECTION ONE OF THE SHERMAN ACT

51. Plaintiffs reassert and reallege each and every allegation of the Complaint set out in Paragraphs 1 - 50, as if fully set forth herein.

52. Defendant Blue Cross has entered into an agreement in restraint of trade or commerce in violation of section one of the Sherman Act. 15 U.S.C. §1. The agreement has been made with HealthSouth Corporation and perhaps others as well. The agreement affects interstate commerce. The agreement has resulted in an antitrust injury to the plaintiffs.

53. The plaintiffs are entitled to damages under 15 U.S.C. §15, et seq.

54. As a result of the illegal agreement, Blue Cross has caused plaintiffs to suffer financial loss in that Blue Cross, with its monopolistic market strength, has: (i) severely curtailed or altogether eliminated reimbursement for services provided by plaintiffs to insured patients; (ii) directed persons covered by medical health benefits plans offered or administered by Blue Cross away from Doctors of Chiropractic; (iii) unilaterally, arbitrarily, and capriciously determined which

19

fully recognized and accepted procedures it will cover and which procedures it will not; (iv) unconscionably imposed conditions for covered chiropractic treatment that are incompatible with accepted chiropractic practices; and (v) utilized pre-certification requirements to deny benefits for medically necessary treatment provided to patients even in emergency situations when pre-certification is neither feasible nor possible due to the conduct of Blue Cross.

55. As a consequence of Blue Cross's illegal agreements, plaintiffs have suffered and will continue to suffer financial loss and have been injured and will continue to be injured in the pursuit of their profession. Plaintiffs are entitled to recover such actual damages as the jury may find, threefold, plus costs, expenses and attorneys' fees. Plaintiffs further seek injunctive relief in the form of an order prohibiting Blue Cross from engaging in the anti-competitive, discriminatory and otherwise wrongful acts as described above.

## COUNT II

## SECTION TWO OF THE SHERMAN ACT

56. Plaintiffs reassert and reallege each and every allegation of the Complaint set out in Paragraphs 1 - 50, as if fully set forth herein.

57. Defendant Blue Cross has acted in violation of section two of the Sherman Act, 15 U.S.C., in that it has monopolized or attempted to monopolize health care reimbursement services in the State of Alabama. Such services are part of the trade or commerce among the several States of the United States. Blue Cross has thereby caused an antitrust injury to the plaintiffs.

58. The plaintiffs are entitled to damages under 15 U.S.C. §15.

59. As a result of the illegal conduct, Blue Cross has caused plaintiffs to suffer financial loss in that Blue Cross, with its monopolistic market strength, has: (i) severely curtailed or

altogether eliminated reimbursement for services provided by plaintiffs to insured patients; (ii) directed persons covered by medical health benefits plans offered or administered by Blue Cross away from Doctors of Chiropractic; (iii) unilaterally, arbitrarily, and capriciously determined which fully recognized and accepted procedures it will cover and which procedures it will not; (iv) unconscionably imposed conditions for covered chiropractic treatment that are incompatible with accepted chiropractic practices; and (v) utilized pre-certification requirements to deny benefits for medically necessary treatment provided to patients even in emergency situations when pre-certification is neither feasible nor possible due to the conduct of Blue Cross.

60.     As a consequence of Blue Cross's illegal conduct, plaintiffs have suffered and will continue to suffer financial loss and have been injured and will continue to be injured in the pursuit of their profession. Plaintiffs are entitled to recover such actual damages as the jury may find, threefold, plus costs, expenses and attorneys' fees. Plaintiffs further seek injunctive relief in the form of an order prohibiting Blue Cross from engaging in the anti-competitive, discriminatory and otherwise wrongful acts as described above.

## COUNT III

### ALABAMA ANTI-TRUST LAWS

61.     Plaintiffs reassert and reallege each and every allegation of the Complaint set out in Paragraphs 1 - 50, as if fully set forth herein.

62.     The Defendant's conduct has occurred in the State of Alabama.

63.     Defendant Blue Cross has acted in violation of the Antitrust Laws of the State of Alabama. Alabama Code, §6-5-60 and §8-10-1 et seq., Ala. Code (1975).

64.     As a result of the illegal conduct, Blue Cross has caused plaintiffs to suffer financial

21

loss in that Blue Cross, with its monopolistic market strength, has: (i) severely curtailed or altogether eliminated reimbursement for services provided by plaintiffs to insured patients; (ii) directed persons covered by medical health benefits plans offered or administered by Blue Cross away from Doctors of Chiropractic; (iii) unilaterally, arbitrarily, and capriciously determined which fully recognized and accepted procedures it will cover and which procedures it will not; (iv) unconscionably imposed conditions for covered chiropractic treatment that are incompatible with accepted chiropractic practices; and (v) utilized pre-certification requirements to deny benefits for medically necessary treatment provided to patients even in emergency situations when pre-certification is neither feasible nor possible.

65. As a consequence of Blue Cross's illegal conduct, plaintiffs have suffered financial loss and have been injured in their pursuit of their profession. Plaintiffs are entitled to recover such actual damages as the jury may find, $500 for each violation, injunctive relief, plus costs, expenses and attorneys' fees.

## COUNT IV

### FRAUD

66. Plaintiffs reassert and reallege each and every allegation of the Complaint set out in Paragraphs 1 - 50, as if fully set forth herein.

67. Blue Cross falsely represented to Drs. Griffiths and Kirby, and through Drs. Griffiths and Kirby to the remaining plaintiffs herein, that it would aggressively market the chiropractic benefits package in the Employees' Plan if that Plan were successful. Blue Cross has failed and refused to market this benefits package, and also has aggressively marketed chiropractic programs with severely curtailed benefits, high deductible, and low annual limits. Further, Blue Cross represented to

22

plaintiffs that it only sold those plans when specifically requested to do so by the employer group. Said representations were material, and were made by Blue Cross willfully to deceive plaintiffs, recklessly and without knowledge, and/or mistakenly and innocently, and thereby constitute legal fraud under Alabama law. Plaintiffs reasonably and justifiably relied on said material misrepresentations to their detriment.

68. As a proximate consequence of said ongoing misrepresentations and fraud, plaintiffs have been and continue to be injured and damaged in that they have suffered financial losses in the form of reduced revenues and lost business opportunities, and they have suffered other actual damages which they are entitled to recover in an amount such as the jury may find them to have sustained, punitive or exemplary damages in an amount at least equal to or an appropriate multiple of plaintiffs' actual damages, plus interests and costs, including attorneys' fees.

69. Plaintiffs therefore demand judgment against Blue Cross for compensatory and punitive damages in an amount to be determined by the Court, plus interest and costs, including attorneys' fees.

## COUNT V

### FRAUD IN THE INDUCEMENT

70. Plaintiffs reassert and reallege each and every allegation of the Complaint as set forth in Paragraphs 1 - 50, as if fully set forth herein.

71. Blue Cross represented to plaintiff Dr. Griffiths and Dr. Kirby, and through them to the remaining plaintiffs, that if they would join the PCP as it was being offered for the Employees' Plan, Blue Cross would (if the program was successful) expand the benefits package in the Employees' Plan and offer it in other group medical health benefits plans that it sold or administered throughout

23

the State.

72. Said representations were false in that Blue Cross has failed and/or refused to extend the benefits package to other employer group plans and, in fact, Blue Cross has aggressively marketed to employer groups a benefits plan with severely curtailed chiropractic benefits (as compared to the benefits offered in the Employees' Plan) or no chiropractic benefits at all (i.e., offering chiropractic benefits as a "rider" to the basic group plan).

73. Said misrepresentations were made by Blue Cross with the intent, at the time they were made, that plaintiffs would rely on them, and plaintiffs did rely on them and in reliance thereon, acted to their detriment.

74. As a proximate consequence of said false representations by Blue Cross, plaintiffs herein were fraudulently induced to join the PCP, which thereby empowered Blue Cross to force plaintiffs, and participating program chiropractors in general, to accept plans with severely curtailed benefits and to perform medically necessary services at reduced rates or for no reimbursement at all. Because Blue Cross dominates the market for insured services in the State of Alabama, plaintiffs are forced to either accept Blue Cross's terms or be denied the ability to provide chiropractic treatment to more than 70% of the insured market in Alabama. Plaintiffs thereby have incurred, and will continue to incur, substantial damages in terms of financial losses and lost professional opportunities as a consequence of the fraud by Blue Cross.

75. By reason of Blue Cross's fraud in the inducement, Plaintiffs have been and continue to be injured in their business and in their revenues, and have suffered and continue to suffer financial losses in the form of reduced revenues and lost business opportunities, and therefore are entitled to recover such actual damages as the jury may find them to have sustained, punitive or

24

exemplary damages in an amount at least equal to or an appropriate multiple of, Plaintiffs' actual damages, and costs, including attorneys' fees.

## VI.

## FRAUD

76. Plaintiffs reassert and reallege each and every allegation of the Complaint as set forth in Paragraphs 1 - 50, as if fully set forth herein.

77. Blue Cross established the Chiropractic Liaison Committee on false and deceitful representations and bases that were designed to deceive and did deceive plaintiffs and other members of the chiropractic profession into believing that Blue Cross was desirous of working with the chiropractic profession to better the relations between the parties and removing the discriminating and anti-competitive bias that had historically existed at Blue Cross with regard to the chiropractic profession. Plaintiffs herein, and members of the chiropractic community in general, were lulled into inaction against Blue Cross by the establishment of this committee and the representations of Blue Cross as to the purposes and goals for which the committee was established. From the beginning, unbeknownst to plaintiffs, the Liaison Committee was a "sham."

78. Blue Cross's fraud is ongoing and continues until the present time. The representations made by Blue Cross and continually to this day made by Blue Cross, were and are false, and Blue Cross knew them to be false at the time they were made, or made them recklessly without regard to the truth or consequences, with the intent that chiropractors in general, including these plaintiffs, would rely upon them and be lulled into inaction, and plaintiffs and chiropractors in general did rely upon them were lulled into traction in reliance thereon, all to their detriment and damage.

79. As a proximate consequence of said misrepresentations and fraud, plaintiffs have been

25

injured and damaged in that they have suffered and continue to suffer financial losses in the form of reduced revenues, lost business opportunities, and diminishment within their profession, as well as other actual damages which plaintiffs are entitled to recover in an amount such as the jury may find them to have sustained, punitive or exemplary damages in an amount at least equal to or an appropriate multiple of, plaintiffs' actual damages, plus interests and costs, including attorneys' fees.

## VII.

### INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONSHIPS

80. Plaintiffs reassert and reallege each and every allegation of the Complaint set out in Paragraphs 1 - 50, as if fully set forth herein.

81. Plaintiffs have a business relationship with each patient for whom chiropractic services are provided.

82. By its conduct as described throughout this complaint, Blue Cross has, without justification or basis, interfered with this business relationship between plaintiffs and their patients in that, among other things, Blue Cross has unreasonably restricted access to doctors of chiropractic by:

   a. impeding, delaying, or discouraging persons covered by Blue Cross plans from seeking or continuing medically necessary treatment from doctors of chiropractic;

   b. directing persons covered by medical health benefits plans offered or administered by Blue Cross away from chiropractors and toward other providers including hospital based physical therapists by unconscionably restricting the terms and extent of coverage of services provided;

   c. unconscionably imposing conditions for covered chiropractic treatment that are incompatible with accepted chiropractic practices;

   d. restricting the scope and magnitude of diagnostic testing by chiropractors despite the fact that such testing is duly authorized by the law of the State of Alabama and the licensing requirements for chiropractors in this state.

26

e.      severely restricting, eliminating, or denying coverage for given services while allowing other providers to be reimbursed for services for which chiropractors are licensed in the State of Alabama.

f.      unilaterally, arbitrarily, capriciously, and without reasonable justification establishing severely restrictive limits for chiropractic services;

g.      establishing higher deductibles and lower benefit limits of benefits offered by chiropractors than for other providers offering comparable services.

83. Blue Cross's interference with plaintiffs' business relations with their patients is done intentionally and with knowledge that this conduct will result in injury and damage to plaintiffs financially in the loss of business opportunities and professionally in the restriction of plaintiffs' licensed ability to render honest services and medically necessary chiropractic care to prospective patients who have medical health benefits coverage provided or administered by Blue Cross. Plaintiffs also have suffered injury and damage to their business reputations and have suffered mental anguish and emotional distress as a consequence of Blue Cross' conduct.

84. Plaintiffs demand judgment against Blue Cross for compensatory and punitive damages in an amount to be determined by the Court, plus interest and costs, including attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for relief as follows:

(a)     that the jury find and this Court adjudge and decree that Defendant Blue Cross has engaged in the violations of law alleged hereinabove;

(b)     that plaintiffs recover such actual damages as the jury shall find plaintiffs to have sustained, together with such double, treble or punitive or exemplary damages as the law shall permit or the jury shall find;

(c)     that the Court issue an injunction enjoining and prohibiting defendant Blue Cross from engaging in the violations of law set forth hereinabove;

(d)     that the Court order expedited discovery on the issues presented by plaintiffs claims for injunctive relief due to the immediate harm being done to plaintiffs by defendant's violations of law set forth hereinabove;

27

(e)     that plaintiffs recover their costs of suit herein, including reasonable attorneys' fees as provided by sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15,26, and the common law; and

(f)     that plaintiffs have such other and further relief as this Court shall deem just and appropriate.

PLAINTIFFS DEMAND TRIAL BY STRUCK JURY ON ALL ISSUES PROPERLY TRIABLE THEREBY.

_____

J. Mark White (ASB-5029-H66J)

_____

William M. Bowen, Jr. (ASB-1285-E66W)

_____

Linda G. Flippo (ASB-0358-F66L)

_____

Augusta S. Dowd (ASB-5274-D58A)

**OF COUNSEL:**

**WHITE, DUNN & BOOKER**
2025 3rd Avenue North
600 Massey Building
Birmingham, Alabama 35203
(205) 323-1888
(205) 323-8907 - facsimile

28

**OF COUNSEL:**

Joe R. Whatley, Jr. (ASB-1222-Y69J)
Pam E. Colbert (ASB-2172-B47P)
Maureen Can Berg (ASB-9961-R74M)
**WHATLEY, DRAKE, L.L.C.**
1100 Financial Center
505 North 20th Street
Birmingham, Alabama 35203
(205) 328-9576
(205) 328-9669 - facsimile

**Plaintiffs' Addresses:**

Dr. Jonathan H. Griffiths
5290 Old Springville Road, Suite 106
Pinson, Alabama 35126

Griffiths Chiropractic Care, P.C.
5290 Old Springville Road, Suite 106
Pinson, Alabama 35126

Dr. J. Matthew Youngblood
260 South Cody Road
Mobile, Alabama 36695

Youngblood Chiropractic, P.C.
260 South Cody Road
Mobile, Alabama 36695

Dr. Ronald F. Ivie
830 Montclair Road
Birmingham, Alabama 35210

Ivie Chiropractic Clinic
830 Montclair Road
Birmingham, Alabama 35210

Dr. J. Robert Hollis, Jr.
7201 Copperfield Drive
Montgomery, Alabama 36117

J. Robert Hollis, Jr., D.C., P.C.
7201 Copperfield Drive
Montgomery, Alabama 36117

Dr. M. Burton Anderson
215 West College Street
Florence, Alabama 35630

Anderson Chiropractic Clinic
215 West College Street
Florence, Alabama 35630

Dr. Jody S. Gray
4329 Main Street
Pinson, Alabama 35126

Gray Chiropractic Center
4329 Main Street
Pinson, Alabama 35126

Dr. Peter DeFranco
3166 Allison-Bonnett Road
Hueytown, Alabama 35023

Hueytown Chiropractic Clinic, LLC
3166 Allison-Bonnett Road
Hueytown, Alabama 35023

Dr. Carl Nelson
P.O. Box 1382
947 South 3 Notch Street
Andalusia, Alabama 36420

Nelson Chiropractic Clinic
P.O. Box 1382
947 South 3 Notch Street
Andalusia, Alabama 36420

Dr. Kevin Palmer
43431 Highway 195
Haleyville, Alabama 35565

Palmer Chiropractic Clinic
43431 Highway 195
Haleyville, Alabama 35565

30

Gray Chiropractic Center
4329 Main Street
Pinson, Alabama 35126

Dr. Peter DeFranco
3166 Allison-Bonnett Road
Hueytown, Alabama 35023

Hueytown Chiropractic Clinic, LLC
3166 Allison-Bonnett Road
Hueytown, Alabama 35023

Dr. Carl Nelson
P.O. Box 1382
947 South 3 Notch Street
Andalusia, Alabama 36420

Nelson Chiropractic Clinic
P.O. Box 1382
947 South 3 Notch Street
Andalusia, Alabama 36420

Dr. Kevin Palmer
43431 Highway 195
Haleyville, Alabama 35565

Palmer Chiropractic Clinic
43431 Highway 195
Haleyville, Alabama 35565

Dr. Jerry S. Kirby
6148 Atlanta Highway
Montgomery, Alabama 36117

Kirby Chiropractic Clinic
6148 Atlanta Highway
Montgomery, Alabama 36117

**Defendant's Address:**

Blue Cross Blue Shield of Alabama
Attention: Greg Till, Esq.
450 Riverchase Parkway East
Birmingham, Alabama 35242

**PLEASE SERVE DEFENDANT VIA CERTIFIED MAIL**

# PARTICIPATING CHIROPRACTOR AGREEMENT

## WITH

## BLUE CROSS AND BLUE SHIELD OF ALABAMA



# CHIROPRACTIC FEE SCHEDULE
## EXHIBIT A

| Procedure | *Allowance | Procedure | *Allowance |
|-----------|-----------|-----------|-----------|
| 72010 | $ 82 | 97033 | $ 28 |
| 72020 | $ 38 | 97034 | $ 21 |
| 72040 | $ 53 | 97035 | $ 20 |
| 72050 | $ 81 | 97110 | $ 14 |
| 72052 | $ 92 | 97112 | $ 11 |
| 72069 | $ 49 | 97113 | $ 11 |
| 72070 | $ 61 | 97116 | $ 22 |
| 72072 | $ 67 | 97122 | $ 18 |
| 72074 | $ 82 | 97124 | $ 21 |
| 72080 | $ 49 | 97250 | $ 21 |
| 72090 | $ 68 | 97260 | $ 27 |
| 72100 | $ 69 | 97261 | $ 10 |
| 72110 | $ 91 | 97530 | $ 33 |
| 72114 | $141 | 99201 | $ 35 |
| 73030 | $ 54 | 99202 | $ 43 |
| 95904 | $ 40 | 99203 | $ 63 |
| 97010 | $ 12 | 99204 | $ 86 |
| 97012 | $ 20 | 99205 | $131 |
| 97014 | $ 21 | 99211 | $ 25 |
| 97016 | $ 20 | 99212 | $ 33 |
| 97018 | $ 27 | 99213 | $ 38 |
| 97022 | $ 16 | 99214 | $ 49 |
| 97024 | $ 21 | 99215 | $ 73 |
| 97026 | $ 20 | A2000 | $ 27 |
| 97032 | $ 21 | | |

* The Chiropractor agrees to accept the allowable amount or their normal billed charge,
whichever is less, as payment in full.

## PARTICIPATING CHIROPRACTOR AGREEMENT

### WITH

### BLUE CROSS AND BLUE SHIELD OF ALABAMA

This Participating Chiropractor Agreement is effective on the date stated in the Application referred to and incorporated as a part of this Agreement between the Chiropractor who completed and signed the Application ("Chiropractor") and Blue Cross and Blue Shield of Alabama ("Corporation"), as parties to this Agreement. In consideration of the mutual covenants and promises recited herein, the parties agree as follows:

## I.   RECITALS AND PURPOSES

1.1   Chiropractor is licensed under Alabama law to provide chiropractic services.

1.2   Corporation is an Alabama not-for-profit health care service corporation, organized and licensed under Alabama law to enter into agreements with employers and other organizations for provision of health care services and to enter into contracts with chiropractors and other health care providers to provide those services.

1.3   Chiropractor and Corporation have mutual interests in promoting the ability of the health care system to continue to provide health care to the public despite the increasing costs of health care. They therefore enter into this Agreement toward the ends of delivering and financing chiropractic care through an arrangement (the "Participating Chiropractor Program") for the provision of such care through less costly means to members of the public choosing chiropractic benefits through that arrangement. The objective of this Agreement accordingly is the prospective financing of benefits of chiropractic care at a lower cost to the public for chiropractic services that both are medically necessary and are provided in the least costly setting and method consistent with the needs of patients for chiropractic care.

1

1.4 In furtherance of the above-stated objective, it is the purpose of Corporation under this Agreement to afford to members of the public the "Participating Chiropractor Program" (PCP) in order to promote the public interests stated above, and it is the purpose of Chiropractor hereunder to provide chiropractic services in accordance with the "Participating Chiropractor Program" in order to promote the public interests stated above.

## II. DEFINITIONS

2.1 "Agreement" means this Agreement, which includes the Chiropractor's Application incorporated herein by reference, the Exhibits attached hereto and all modifications and updates of them, and all Amendments to this Agreement.

2.2 "Benefit Agreement" means the written agreement entered into by Corporation with a group or organization or person under which Corporation provides, indemnifies against, or administers chiropractic care benefits covered under Corporation's Participating Chiropractor Program.

2.3 "Fee Schedule" means the schedule of chiropractic procedures and fee amounts for such procedures as established by Corporation under the Participating Chiropractor Program which is attached as Exhibit A to this Agreement, and includes fee amounts and procedures as established, updated, and adjusted pursuant to Sections 6.5, and 6.6.

2.4 "Medically Necessary" means when services or supplies provided or to be provided to a Member under the provisions of this Agreement are determined to be:

(1) appropriate and necessary for the symptoms, diagnosis, or treatment of the Member's medical condition, and

(2) provided for the diagnosis or direct care and treatment of the Member's medical condition, and

(3) within standards of good chiropractic practice accepted by the organized medical community, and

(4) not primarily for the convenience of the Member, the Member's chiropractor, or another provider of chiropractic services, and

(5) the most appropriate supply or level of service which can safely be provided. For chiropractic services this means the treatment that can provide the chiropractic services in the most cost-effective method.

2

2.5 "Chiropractic Services" mean those chiropractic services rendered to a Member by Chiropractor for which benefits are provided by the Benefit Agreement under which the Member receiving those services is enrolled.

2.6 "Members" mean Subscribers and their enrolled dependents covered under a Benefit Agreement for benefits under the Participating Chiropractor Program.

2.7 "Participating Chiropractor" means a Chiropractor or group of Chiropractors who have entered into a Participating Chiropractor Agreement with Corporation.

2.8 "Participating Chiropractor Program" means a program designed and promoted to (i) further the interests of the public in obtaining chiropractic care in the least costly method consistent with a patient's condition, (ii) achieve the objectives of Chiropractor and Corporation to provide chiropractic care at lesser costs, (iii) encourage Members to utilize Participating Chiropractors while preserving to them the right to choose any chiropractor, and (iv) to pay Participating Chiropractors on a fee-for-service basis for Medically Necessary services that are appropriate to the needs of Members for chiropractic care.

2.9 "Participating Chiropractor Recertification Process" means the process by which Corporation recertifies Chiropractors for continued participation in the Participating Chiropractor Program.

2.10 "Participating Provider" means any provider of health care services or supplies (such as a Participating Chiropractor) who has an agreement with Corporation to furnish services or supplies to Members entitled to benefits under a Benefit Agreement.

2.11 "Subscribers" mean persons who are eligible for, enrolled under, and covered by the terms and conditions of a Benefit Agreement.

2.12 "Utilization Review" means the review and determination of whether Chiropractic Services which have been or are to be provided to a Member, and which are covered services, are Medically Necessary. Some examples are determinations of whether a particular chiropractic service or diagnostic service is necessary and appropriate for a Member's chiropractic condition.

3

## III. RELATIONSHIP BETWEEN CORPORATION, CHIROPRACTOR AND MEMBERS

3.1 Chiropractor and Corporation are independent legal entities. Nothing in this Agreement shall be construed or be deemed to create between them any relationship of employer and employee, principal and agent, partnership, joint venture, or any relationship other than that of independent parties contracting with each other solely to carry out the provisions of this Agreement for the purposes recited in Article I.

3.2 It shall be the right and responsibility solely of Chiropractor to create and maintain a provider/patient relationship with each Member that Chiropractor treats, and Chiropractor shall be solely responsible to each Member for all aspects of chiropractic care and treatment within the scope of Chiropractor's professional license, including the quality and levels of such care and treatment.

3.3 It shall be the responsibility solely of Corporation to Members for the creation and maintenance of the Member/Corporation relationship with each Member, and Corporation shall be solely responsible for matters relating to the handling and processing of claims payments for Chiropractic Services and the premium billing and coverage of Members under Benefit Agreements.

3.4 Consistent with Sections 3.2 and 3.3 above and the other provisions of this Agreement, neither party will be required to assume or bear any of the responsibilities, or any consequences thereof, of the other party under this Agreement. Neither Chiropractor nor Corporation nor any of their respective agents or employees shall be responsible to other persons  except for assignments permitted by Section 11.1) for any act or omission of the other party in performance of their respective responsibilities under this Agreement.

3.5 Chiropractor's right to recommend or advise patients on the choice of hospitals, outpatient centers or other chiropractic care facilities, or specialists, consultants, or other chiropractic service providers in the treatment of patients shall not be restricted by this Agreement. However, Chiropractor is expected to refer patients to other Participating Chiropractors or Participating Providers except where Chiropractor, in accordance with standards of good chiropractic practice, believes that the patient's chiropractic condition warrants referral to another Chiropractor or provider. Coverage by Corporation of the services of such other providers will be dependent upon and subject to the terms

4

and provisions of the particular Benefit Agreement under which the Member is covered.

3.6 No provision of this Agreement shall require Chiropractor to enter into or continue a provider/patient relationship with any Member.

3.7 Chiropractor authorizes Corporation for the term of this Agreement to obtain all information regarding Chiropractor on file with the National Practitioner Data Bank ("Data Bank"). Chiropractor agrees that Corporation may obtain such information upon application and at periodic intervals thereafter as deemed necessary by Corporation in connection with its Participating Chiropractor Recertification process. Corporation agrees to pay all fees charged by the Secretary of Health and Human Services for the information requested at the time of application. Corporation will pay all such fees associated with subsequent requests for information from the Data Bank. Corporation agrees to use information provided by the Data Bank solely in connection with the Participating Chiropractor Program, to keep such information confidential and not to disseminate such information, in whole or in part, to third persons or entities, except as is authorized or required by state or federal law or regulation or by Chiropractor. Upon request, Corporation will make available to Chiropractor all information obtained regarding Chiropractor from the Data Bank. Chiropractor agrees to execute all consents, authorizations or other documents as may be required by the Data Bank prior to the release of information directly to Corporation, and to perform all other and further reasonable acts necessary to enable Corporation to obtain information directly from the Data Bank. In the event that the Data Bank refuses to provide information directly to Corporation, Chiropractor agrees to promptly request and obtain such information for the Data Bank upon request by Corporation and to provide all information so obtained to Corporation immediately upon receipt.

## IV. CHIROPRACTIC SERVICES AND RESPONSIBILITIES

4.1 Chiropractor agrees to provide Chiropractic Services to Members in accordance with this Agreement.

4.2 Chiropractor agrees to maintain in good standing all licenses required by law including the license to practice in the State of Alabama and to comply with any requirements necessary to remain accredited.

5

4.3 Chiropractor agrees to provide to each Member the Chiropractic Services for which benefits are provided by the Benefit Agreement under which the Member is covered only when and to the extent that such Services are Medically Necessary. Except as otherwise provided by this Agreement, such Services will be provided to each Member in the same manner and in accordance with the same standards as for other patients of Chiropractor.

4.4 Chiropractor agrees to accept as payment in full for all Chiropractic Services the lesser of the Chiropractor's usual charge or fee amounts set forth in Article VI.

4.5 Chiropractor agrees to make no charge for Chiropractic Services except to the extent permitted by this Agreement and the Member's Benefit Agreement. Chiropractor may waive a particular co-payment or co-insurance amount for reasons of professional courtesy or because the patient is perceived as unable to pay. With these exceptions, Chiropractor must bill the Member for any co-payment and co-insurance amounts applicable under the Member's Benefit Agreement to Chiropractic Services provided by Participating Chiropractors, but the total amount payable by both the Member and Corporation shall not exceed the amount payable under Article VI for such Chiropractic Services. If Chiropractor, except in cases of professional courtesy or inability to pay, does not bill the Member for any co-payment and/or co-insurance amounts applicable under the Member's Benefit Agreement or if Chiropractor does not make a reasonable good faith effort to collect such billed amounts, or if Chiropractor waives or represents that he waives such amounts, then Chiropractor has breached this Agreement and may be immediately terminated under Article XI. Chiropractor may bill the Member the amount prescribed in Section 6.3 for chiropractic services which are not covered under the Member's Benefit Agreement because of exclusions and limitations in the Benefit Agreement (typical examples being services for experimental or investigative treatment. Chiropractor will not bill the Member for services which are determined by Corporation to be not Medically Necessary except in the following instances: Chiropractor may bill the Member for services which are not Medically Necessary if, prior to the rendition of each service, the Member has been apprised that the service may be deemed to be not Medically Necessary and has nevertheless agreed with Chiropractor in writing to be responsible for payment of charges for each such service.

4.6 Chiropractor has accurately completed the Participating Chiropractor Application which is incorporated by

6

reference as a part of this Agreement. Chiropractor will promptly notify Corporation of any change in the information contained on the Application, including any change of principal place of business, within thirty (30) days of such change. Chiropractor will be recertified from time to time in accordance with Section 2.9.

4.7 Chiropractor agrees that Members will be provided Chiropractic Services in the most efficient manner and setting consistent with the chiropractic needs and condition of Members and toward that end, that such Services will be provided in accordance with the provisions of Article VII.

4.8 Chiropractor agrees to complete and file on a timely basis all claims for benefits for Chiropractic Services rendered to Members, using either a claim form designated by Corporation or alternative electronic claims submission media ("EMC") in a format specified by Corporation, including all applicable procedure and diagnosis codes and Chiropractor's charges usually and customarily billed for such Chiropractic Services.

4.9 In the event through error or mistake or impropriety of Corporation, Chiropractor, or any other person or entity, Corporation, makes, or is shown through any provision of this agreement and any applicable Benefit Agreement to have made, any payment to Chiropractor for services to a Member which is not due to be paid under this Agreement, and the applicable Benefit Agreement, Chiropractor agrees that Corporation, at its sole option, may request a refund from Chiropractor, which Chiropractor agrees to pay promptly upon request, may recoup such sums from Chiropractor, or may set off such sums against future payments due Chiropractor from Corporation. These remedies shall be cumulative. In the event that the fact of such overpayment is determined through the audit procedures provided in this Agreement, Chiropractor shall have thirty (30) days from the mailing of the letter reporting the audit findings within which to lodge a written protest of such findings. Failure to lodge a timely written protest shall constitute Chiropractor's acceptance of the audit findings and shall make the findings final, binding and immune from future review or collateral attack. Once final and binding, audit findings shall be subject to disclosure as provided in Section 4.10.

4.10 Chiropractor agrees that Corporation may disclose audit findings that become final and binding under Section 4.9 upon request by Subscribers and group Benefit Plan Sponsor for Subscribers.

7

4.11 Chiropractor agrees to file claims under this Agreement using accurate, non-duplicative coding and in the form and manner as Corporation may prescribe from time to time.

4.12 Chiropractor agrees to cooperate fully with and to provide complete and accurate information promptly as Corporation may request from time to time in connection with the Participating Chiropractor Recertification Process. Upon Chiropractor's failure to comply with these requirements, Corporation may, in its sole discretion, delete Chiropractor's name from the Participating Chiropractor Directory, or take other action up to and including terminating this Agreement pursuant to Article X.

4.13 Chiropractor agrees to give Corporation written notice within seventy-two (72) hours of any action wherein Chiropractor's license, or any privilege, registration or other right or authorization incident to the practice of Chiropractic care is in any way restricted, suspended or revoked, whether temporarily or permanently.

## V.   CORPORATION SERVICES AND RESPONSIBILITIES

5.1 Corporation agrees to pay Chiropractor for the Chiropractic Services in accordance with the provisions of Article VI. In the event Corporation through error pays benefit amounts to its Member rather than Chiropractor for Chiropractic Services, Corporation shall pay Chiropractor for Chiropractic Services in accordance with Article VI, and may seek refund of such erroneous payment from its Member.

5.2 Corporation shall process all of Chiropractor's "clean claims" within 30 calendar days. "Clean claims" means those claims submitted by Chiropractor in accordance with Sections 4.8, 4.11 and Exhibit B which are accurately completed and contain all information specified by Corporation and which do not require further information for processing by Corporation from either Chiropractor, Member, or any other party. If Corporation fails to pay "clean claims" within forty-five (45) calendar days of receipt, interest shall be paid by Corporation to Chiropractor at the rate of one and one-half percent per month on the amount of such "clean claims."

5.3 Corporation agrees to consult with and obtain the advice of the Participating Chiropractor Advisory Committee

8

concerning the appropriateness of the criteria contained in Exhibit B and to utilize such consultation and advice in the modification of such criteria.

5.4    Corporation agrees to grant Chiropractor the status of "Participating Chiropractor," to identify Chiropractor as a Participating Chiropractor in information concerning its Participating Chiropractor Program distributed to Members, and to encourage Members to seek necessary services from Participating Chiropractors. Corporation agrees to continue Chiropractor's status as a Participating Chiropractor until this Agreement terminates in the manner provided in Article X.

5.5    Corporation agrees to provide Chiropractor with a list of all Participating Chiropractors participating in the Participating Chiropractor Program.

5.6    Corporation agrees to identify to Chiropractor, by either identification cards, bulletins, or other appropriate means, those Members who are entitled to Participating Chiropractor Program benefits.

5.7    Corporation shall provide educational materials for its Members explaining the design, goals and objectives of the Participating Chiropractor Program and the scope of benefits.

5.8    From the usual and customary billing data submitted by Chiropractor in accordance with Section 4.8, Corporation agrees to update its "Usual, Customary and Reasonable" fee program data files in accordance with its normal business practices.  Payments made by Corporation under this Agreement shall not be utilized for, and shall have no effect upon, "usual fee" determinations made by Corporation under its Usual, Customary and Reasonable fee program established for its non-governmental lines of business besides Medicare.

5.9    Corporation shall periodically provide Chiropractor with administrative bulletins, group benefit summaries, claims submission guidelines, and other administrative details to assist Chiropractor in obtaining prompt and expeditious payment and promote efficient submission and processing of Chiropractor's claims for Chiropractic Services.

5.10   There will be an Advisory Committee and one or more Chiropractor Hearing Committees.

9

a.   Chiropractic Advisory Committee

Purposes.   The Chiropractic Advisory Committee shall serve as the principal liaison between the Participating Chiropractors and Corporation for the purposes of providing to Corporation advice and recommendations relating to matters involved and arising in the Participating Chiropractor Program that pertain to the practice of chiropractic care and the quality of chiropractic care.   The functions of the Committee shall include the provision of advice and recommendations to Corporation concerning (a) chiropractic treatment guidelines under Exhibit B, (b) other matters involving professional chiropractic expertise and judgment and the quality of chiropractic care, and (c) the course and direction in general of the Participating Chiropractor Program in relation to professional matters involving the practice of Chiropractic care.   In the performance of its functions the Committee shall consult with Participating Providers, including medical specialty organizations or groups as appropriate.

Composition.   The Chiropractors Advisory Committee shall be composed of five (5) chiropractors participating in the Participating Chiropractor Program distributed according to geographical distribution of Chiropractors within the State of Alabama.

Rules and Procedures.   The Chiropractic Advisory Committee shall establish, and may amend from time to time, rules and procedures consistent with the provisions of this Agreement and applicable law for the governance and operation of the Chiropractic Advisory Committee and the Chiropractic Hearing Committees.

b.   Chiropractic Hearing Committees

Purpose.   One or more Chiropractic Hearing Committees shall determine in accordance with Section 8.2 any disputes between Participating Chiropractors and Corporation.

Establishment and Composition.   The Chiropractic Hearing Committee or Committees shall be established by the Chiropractic Advisory Committee. All members of the Chiropractic Hearing Committee shall be Participating Chiropractors in good standing.   The number of Chiropractic Hearing

10

Committees and the number of members comprising each such Committee shall be determined by the body establishing them.

c.   <u>Costs</u>

Corporation shall pay the costs of the Chiropractic Advisory Committee and Chiropractic Hearing Committee or Committees.

## VI.   PAYMENT AND BILLING

6.1   Corporation will pay to Chiropractor for Chiropractic Services the lessor of Chiropractor's usual charge or fee amounts as specified for the Chiropractor for the chiropractic procedures in the Fee Schedule.

6.2   Chiropractor will seek payment only from Corporation for the provision of Chiropractic Services to all Members covered by a Benefit Agreement.  Where there is another source of payment (other than a Member and Corporation) for the Service provided, Chiropractor may also seek payment from such other source, subject to the provisions of the Benefit Agreement under which the Member is enrolled.  In such situations Chiropractor must file claims directly with such other source on behalf of Member.

In cases involving application of coordination of benefits or non-duplication of benefits provisions of Benefit Agreements when the Member is covered under a Benefit Agreement and another chiropractic benefit plan or program (except another group plan underwritten or administered by Corporation), the following rules shall apply:

a.   For cases in which Corporation is the primary plan, Chiropractor may bill the Member's secondary benefit plan for any difference between the fee amount payable under this Agreement and Chiropractor's usual charge for the Chiropractic Service provided.

b.   For cases in which Corporation is "the secondary plan," Corporation shall pay Chiropractor any difference between the amount payable by the Member's primary plan and the fee amount payable under this Agreement for the Chiropractic Service provided.

11

6.3   Chiropractor agrees to accept the fee amount payable
      under this Agreement or Chiropractor's usual charge,
      whichever is less, as payment in full for each
      Chiropractic Service provided to a Member.  Such payment
      shall be for Chiropractic Services provided on or after
      the effective date of this Agreement and during the time
      the Member's Benefit Agreement is in effect.

6.4   Corporation shall utilize the American Medical
      Association's (AMA) Current Procedural Terminology
      ("CPT") in establishing and updating the Fee Schedule.
      As CPT coding revisions and updates are issued by the
      American Medical Association, Corporation will utilize
      such updates and revisions as appropriate.

6.5   The fee amounts set forth in Exhibit A shall be in effect
      for services rendered through December 31, 1995.  Such
      amounts shall be reviewed annually thereafter.
      Corporation's purpose and intent shall be to maintain a
      Fee Schedule in which the amounts are neither excessively
      high nor excessively low for any procedure.  For the
      purpose of correcting inequities in the Fee Schedule
      which may occur due to factors listed below,  Corporation
      may review and adjust at any time, either upward or
      downward,  individual procedure Fee Schedule amounts
      listed in Exhibit A to this Agreement.  In such review,
      Corporation may adjust Fee Schedule amounts upward or
      downward in order to maintain a Fee Schedule which is
      reflective of a competitively-priced, volume purchase of
      Chiropractic Services on a prospective, prudent buyer
      basis and which takes into account the following factors:

      (1)   The influence of changing and evolving technology
            upon the cost, equipment, time and other related
            resources utilized in performing chiropractic
            procedures;

      (2)   The inflationary impact upon the overhead,
            administrative, acquisition and productive costs,
            malpractice coverage and other costs of provision
            of such services;

      (3)   Competitive pricing data for such Chiropractic
            Services by other competing health care programs;
            and

      (4)   Any time and effort-saving techniques or
            simplifications and any increased efficiencies from
            automation or otherwise which are being employed.

6.6   In order to maintain a Fee Schedule which is reflective
      of and current with evolving changes in chiropractic

                              12

practice, Corporation may from time to time recognize newly developed chiropractic procedures to add to Exhibit A and delete outmoded or inappropriate chiropractic procedures from Exhibit A. As newly developed chiropractic procedures are recognized by Corporation for payment under this Agreement, Corporation will establish fee amounts for such new procedures which are proportionally equivalent to those for other procedures of similar nature and complexity.

6.7 Chiropractor will furnish, upon request, all information reasonably required by Corporation to substantiate the provision of Chiropractic Services, the Medical Necessity of such Services, and the charges for such Services. Corporation may review all claims submitted by Chiropractor, and relevant chiropractic records of Members when necessary, to appropriately apply the terms of this Agreement or the applicable Benefit Agreement of the Member.

6.8 The inclusion of a procedure on Exhibit A does not mean that payment will be made for the procedure in all cases. Payment for any procedure will be dependent on whether the procedure is Medically Necessary in the circumstances and within the terms of the Benefit Agreement under which the Member receiving the Service is covered.

## VII. RECORDS

7.1 Chiropractor shall prepare and maintain all appropriate records on Members receiving Chiropractic Services. The records shall be maintained in accordance with prudent record-keeping procedures and as required by law, and as may be needed by the parties hereto for performance of this Agreement.

7.2 Participating Chiropractor agrees to allow audit and duplication (at Corporation's expense) of billing, payment and medical records pertaining 'to Members enrolled under a Participating Chiropractor Program Benefit Agreement. Such audit and duplication will be allowed upon reasonable notice during regular business hours.

7.3 Chiropractic records of Members will be made available to Corporation for utilization review purposes upon reasonable request. Corporation warrants that it has a contractual right with its Members to obtain any and all patient information from Participating Chiropractor relevant to a determination of whether and to what extent benefits may be provided under Benefit Agreements.

13

## VIII. DISPUTE RESOLUTION

8.1   Corporation and Chiropractor agree to meet and confer in good faith to resolve any problems or disputes that may arise under this Agreement.

8.2   It is the mutual intent and purpose of the parties that issues of Medical Necessity and related issues requiring chiropractic judgment and expertise arising under this Agreement be resolved by panels of practicing Chiropractors, and that such resolutions be final and binding upon both parties. Accordingly, in the event that any dispute arising under this Agreement (except the amounts of fees in Schedule A which are set by Corporation in its sole discretion) is not satisfactorily resolved between the parties under Section 8.1, Corporation and Chiropractor agree to resolve such dispute in the following manner:

   a.   Appeal to Chiropractic Hearing Committee.   Such dispute shall be presented for determination by a Chiropractic Hearing Committee established under Section 5.10. Either party may request a hearing for presentation of the disputed matter. If a hearing is requested, both parties will be notified of the time and place of hearing. In the absence of request for a hearing, the Chiropractic Hearing Committee shall make its determination on the records presented by each party. The Chiropractic Hearing Committee shall render its determination within thirty (30) days after submission of the dispute on records or through a hearing. Such determination, in the absence of a timely notice of arbitration as provided below, shall become final and binding on both parties upon the passage of thirty (30) days following the date of determination by the Chiropractic Hearing Committee.

   b.   Arbitration.   If either party desires to arbitrate the determination of a Chiropractic Hearing Committee, a notice of arbitration shall be mailed to the opposite party not later than thirty (30) calendar days from the date of the Chiropractic Hearing Committee determination. An Arbitration Panel shall be comprised of one member appointed by the Chiropractor, one member appointed by Corporation, and a third member appointed jointly by the appointees of the Chiropractor and Corporation. If the two appointees cannot agree upon a third member within fifteen (15) days of their appointment, the Chairman of the Chiropractic

14

Advisory Committee shall appoint the third member.
All members of the Arbitration Panel shall be
licensed Chiropractors and members of the
Participating Chiropractic Program in good
standing. Following appointment, the Arbitration
Panel shall review the matter in dispute and render
a written decision within thirty (30) days
following the review. Determination of the
Arbitration Panel shall be binding on the parties
and shall become final as of the date of notice
thereof to both parties. Reasonable costs of
conducting the Arbitration Panel shall be paid by
the party against whom the determination is
rendered, and each party shall bear its own
respective costs of presenting the matter to the
Arbitration Panel.

8.3   Determinations made by the Chiropractor Hearing Committee
and the Arbitration Panel concerning disputes arising
from the Utilization Review provisions of the Agreement
which become final and binding on the parties in
accordance with this Article shall be enforceable in any
court of competent jurisdiction. Neither party shall
have any right, claim, or action against the other, and
each party hereby agrees not to bring any judicial action
or proceeding against the other to enforce, apply, or
otherwise resolve issues governed by the provisions of
this Agreement, except for the enforcement of
determinations made pursuant to the remedies provided in
this Article VIII.

8.4   It being the intent and purpose of the parties in
promoting and furthering the purposes of this Agreement,
which includes moderating and containing the cost of
health care and enhancing the relationship among Members,
Participating Chiropractor and Corporation, and the
parties hereby acknowledge that the provision of health
care pursuant to this Agreement takes place in and
substantially affects interstate commerce and that the
Federal Arbitration Act permits and promotes the use of
arbitration as a means of dispute resolution in matters
arising from interstate commerce, the parties accordingly
adopt the following provisions with the purpose of
effecting a more beneficial, efficient and effective
means of dispute resolution.

   (a)   Any controversy, dispute, or claim by any Member
         arising out of the rendering of chiropractic,
         medical and other health care services by
         Chiropractor shall be submitted to binding
         arbitration pursuant to the provisions of the
         Federal Arbitration Act, 9 U.S.C. § 1, et seq.

15

provided that the Member is required to submit such claims to binding arbitration under the applicable Benefit Agreement at the time the services in question are rendered. Such arbitration shall be governed by the rules and provisions of the American Arbitration Association's Dispute Resolution Program for Insurance Claims.

Chiropractor further understands that the arbitration shall be binding upon Chiropractor as well as the Member and that it may not be set aside in later litigation except upon the limited circumstances set forth in the Federal Arbitration Act.

Judgment upon the award rendered by the arbitrator may be entered in any Court having jurisdiction thereof. The arbitration expenses shall be borne by the losing party or in such proportion as the arbitrator(s) shall decide.

## IX.  MARKETING

9.1   Corporation shall use its best efforts to encourage Members to use the services of Participating Chiropractors. Such efforts shall include, by way of example and not limitation, the following:

    a.   During the term of this Agreement and prior to receipt of any notice of its termination, Corporation shall identify Chiropractor as a Participating Chiropractor to customer group accounts which have entered into Benefit Agreements and which have Members residing in the geographic area of Chiropractor's practice.

    b.   Corporation shall design and promote Benefit Agreements for its customer group accounts which provide greater chiropractic care and financial benefits and other incentives to Members to utilize Participating Chiropractors.

9.2   While this Agreement is in effect Corporation may use the name of Chiropractor for purposes of informing Members of the identity of Participating Chiropractors (unless Corporation is instructed to the contrary in writing by Chiropractor) and otherwise carrying out the terms of this Agreement; likewise, Chiropractor shall have the right to inform his patients and the public that he participates in the Participating Chiropractor Program.

16

9.3 Except as provided in Section 9.2, Corporation and Chiropractor each reserves the right to, and the control of the use of, its name and all symbols, trademarks and service marks presently existing or later established. In addition, except as provided in Section 9.2, neither Corporation nor Chiropractor shall use the other party's name, symbols, trademarks or service marks without the prior written consent of that party and shall cease any such usage immediately upon written notice of that party.

## X. TERM AND TERMINATION

10.1 When executed by both parties, this Agreement shall become effective as of the date indicated in the Application and shall continue in effect until terminated.

10.2 Either party may terminate this Agreement by giving at least sixty (60) days advance written notice thereof to the opposite party. Except for certain circumstances permitting termination with less than sixty (60) days notice as provided for in Sections 10.3, 11.5, and 11.7, termination of this Agreement shall be effective the sixtieth day following the date such notice is mailed, first class postage prepaid, to the opposite party. Any treatment plan commenced on or before the effective date of termination and all applicable terms of this Agreement with respect to such treatment plan shall remain in effect. During the interim period from notice of termination to the effective date of termination, this Agreement shall remain in full force and effect and be fully binding upon both parties. Nothing contained herein shall be construed to limit either party's lawful remedies in the event of a material breach of this Agreement.

10.3 Corporation may, at its sole option, terminate or suspend this Agreement without prior notice if the Chiropractor's license, or any privilege, registration or any other right or authorization incident to the practice of Chiropractic care is in any way restricted, suspended or revoked during the term of this Agreement. Such termination or suspension by Corporation shall be effective immediately upon mailing notice of such termination or suspension to Chiropractor.

10.4 After the effective date of termination, the necessary provisions of this Agreement shall remain in effect for the resolution, in the manner herein provided, of all matters unresolved at the date of termination.

17

10.5 Notwithstanding termination, Corporation shall continue to have access as provided in Article VII for three (3) years following the date of termination to records necessary to carry out the terms of this Agreement.

## XI.  GENERAL PROVISIONS

11.1 <u>Assignment</u>.  No assignment of the rights, duties, or obligations of this Agreement shall be made by Corporation or Chiropractor, except that Chiropractor may assign his right to payments under this Agreement to a professional association, professional corporation, foundation, or other group practice arrangement of which he is a member, owner, or employee.  Any attempted assignment contrary to this provision by either party shall be void and have no binding effect upon the opposite party.

11.2 <u>Waiver of Breach</u>.  Waiver of a breach of any provision of this Agreement shall not be deemed a waiver of any other breach of the same or a different provision.

11.3 <u>Notices</u>.  Any notice required to be given pursuant to this Agreement shall be in writing and shall be sent by first-class, postage prepaid, to Corporation at:

>       Director of Chiropractic Programs
>       Blue Cross and Blue Shield of Alabama
>       450 Riverchase Parkway East
>       Birmingham, Alabama  35298

and to Chiropractor at his address as shown on the most recently dated Application or other written notification of address on file at Corporation's offices.

11.4 <u>Severability</u>.  In the event any provision of this Agreement is rendered invalid or unenforceable by an Act of Congress or of the Alabama Legislature or by any regulation promulgated by officials of the United States or the State of Alabama, or declared null and void by any court of competent jurisdiction, the remainder of the provisions of this Agreement shall, subject to Section 11.5, remain in full force and effect.

11.5 <u>Effect of Severable Provision</u>.  In the event that a provision of this Agreement is rendered invalid or unenforceable or declared null and void as provided in Section 11.4 and its removal has the effect of materially altering the obligations of either party in such manner as, in the judgment of the party affected, (a) will cause serious financial hardship to such party; or (b) will

18

substantially disrupt and hamper the mutual efforts of the parties to maintain a cost-efficient means of delivery of chiropractic care; or (c) will cause such party to act in violation of its corporate Articles of Incorporation or By-laws, the party so affected shall have the right to terminate this Agreement upon thirty (30) days prior written notice to the other party.

11.6 Entire Agreement.  This Agreement, including its Exhibits and the Application, contains, the entire Agreement between Corporation and Chiropractor relating to the rights granted and the obligations assumed by the parties.  Any prior agreements, promises, negotiations or representations, either oral or written, relating to the subject matter of this Agreement and not expressly set forth in this Agreement or an Amendment executed with the same formality as this Agreement are of no force or effect.

11.7 Amendments.  This Agreement or any part of it may be amended at any time during its term by mutual written consent of the parties.

This Agreement or any part of it may be amended by Corporation by mailing such amendment or a revised form of Agreement to Participating Chiropractor at least sixty (60) days prior to the effective date of such amendment. No amendment to Exhibit A may be made by Corporation except in accordance with Sections 6.5 and 6.6.  Exhibit B may be amended by Corporation after receiving the advice of the Chiropractic Advisory Committee and giving advance notice to the Participating Chiropractors prior to the effective date of such amendment.  In the event an amendment by Corporation is not acceptable to Participating Chiropractor, then Participating Chiropractor may terminate this Agreement by giving written notice to Corporation prior to the effective date of the Amendment.  Any such notice of termination shall be effective as of the date of the Amendment.  In the absence of written notice of termination by Participating Chiropractor, Participating Chiropractor shall be deemed to have accepted such amendment(s) as of the effective date thereof.

11.8 Attorneys' Fees.  In the event that either Corporation or Participating Chiropractor institutes any arbitration proceeding or judicial proceeding to enforce the provisions of this Agreement, each party shall bear its own costs and attorneys fees.

11.9 Headings.  The headings of articles and sections contained in this Agreement are for reference purposes

19

only and shall not affect in any way the meaning or
interpretation of this Agreement.

11.10  Gender.  Whenever the masculine gender is used in this
Agreement, it shall also mean and refer to the feminine
gender whenever appropriate.

11.11  Non-Exclusivity.  Nothing in this Agreement shall in any
way be deemed to limit or restrict Participating
Chiropractor from entering into other "Participating
Provider" or other similar arrangements with any other
party.

11.12  Governing Law.  This Agreement shall be construed and
enforced in accordance with the laws of the State of
Alabama except as they may be preempted or superseded by
federal law.  This section shall not be construed as a
waiver of the mandatory arbitration provisions contained
in this Agreement.

11.13  Parties to the Agreement.  Chiropractor hereby expressly
acknowledges his understanding that this Agreement
constitutes a contract between Chiropractor and Blue
Cross and Blue Shield of Alabama, that Blue Cross and
Blue Shield of Alabama is an independent corporation
operating under a license with the Blue Cross and Blue
Shield Association, an association of independent Blue
Cross and Blue Shield Plans, (the "Association")
permitting Blue Cross and Blue Shield of Alabama to use
the Blue Cross and/or Blue Shield Service Mark in the
State of Alabama, and that Blue Cross and Blue Shield of
Alabama is not contracting as the agent of the
Association.  Chiropractor further acknowledges and
agrees that he has not entered into this Agreement based
upon representations by any organization other than Blue
Cross and Blue Shield of Alabama and that no person,
entity, or organization other than Blue Cross and Blue
Shield of Alabama shall be held accountable or liable to
Chiropractor for any of Blue Cross and Blue Shield of
Alabama's obligations to Chiropractor created under this
Agreement.  This paragraph shall not create any
additional obligations whatsoever on the part of Blue
Cross and Blue Shield of Alabama other than those
obligations created under other provisions of this
Agreement.

20

EXHIBIT 3

REIMBURSEMENT GUIDELINES FOR CHIROPRACTIC
AND PHYSICAL MEDICINE SERVICES
BY BLUE CROSS BLUE SHIELD OF ALABAMA

ADOPTED April 1, 1995

Portions of these guidelines were taken from the Alabama
State Chiropractic Association's Chiropractic Manual.

Chiropractic Manual
Adopted: 4/95
Page 2

TABLE OF CONTENTS

General Program Guidelines.............................3

Definition of Chiropractic Care.........................5

Definition of Physical Medicine Services...............5

Definition of Qualified Personnel......................6

State Code of Chiropractic Care........................7

Scope of Practice......................................9

Physical Medicine Guidelines..........................10

Table of Common Physical Agents & Their Effects........12

Occupational Therapy..................................13

Standards of Documentation............................14

Definition of Maintenance Care........................16

Criteria for Discharge................................16

Frequency of Treatment................................17

Duration of Treatment.................................17

Appropriate Testing...................................18

Office Visit Coding...................................19

Requesting Records....................................20

Criteria for Approval/Denial..........................20

Glossary..............................................21

Chiropractic Manual
Adopted: 4/95
Page 3

## GENERAL PROGRAM GUIDELINES

The guidelines contained within are not intended in any way to
imply that treatment rendered over and above these limits
constitutes overutilization or that if treatment is provided
within these guidelines, payment will be made.  Rather, these
guidelines are intended to indicate that treatments over these
specific trigger points are subject to review for appropriateness
of treatment, medical necessity or contract limitations by a
qualified reviewer.  All treatment must include proper
documentation for services rendered.

Medical necessity must be documented for all services rendered.
All charts will be reviewed for inclusion of a history and
physical, plan of care, physical exam findings and progress or
treatment notes.  Payment is made in accordance with the Benefit
Agreement applicable to the patient.  The patient must be covered
by a Benefit Agreement providing chiropractic care at the time
services were rendered.

Exhibit A contains the list of codes eligible for reimbursement
and the allowable fees for that service.  Procedure codes not
listed in Exhibit A should be filed under the patient's standard
benefits, with co-pays and deductibles due.

Preauthorization is required after the 12th visit if you feel the
patient's care will require more than 18 visits.  If
precertification is not obtained, coverage for all services
associated with the 19th visit and subsequent visits will be
denied and the patient will be held harmless.  Patients may be
billed if they have signed a non-covered statement (attached)
indicating that they have been properly informed that the services
to be rendered are not covered by their Benefit Agreement and that
they will be responsible for paying for the services.



When filing for a precertification, plan of care and rationale
information must be received prior to the 18th visit for future
care to be covered.  This information can be sent via mail to:

                ATTENTION:  SHERRI MARTIN
                Medical Review Programs
                Blue Cross and Blue Shield fo Alabama
                420 Riverchase Parkway
                P.O. Box 995
                Birmingham, Alabama  35298

                    - OR -

                FAXED TO:  (205) 444-6344
                ATTENTION:  SHERRI MARTIN

Questions regarding this process should be directed to Sherri
Martin at (205) 733-7202 (local) -OR- 1-800-845-6035.

Chiropractic Manual
Adopted: 4/95
Page 4

ADDITIONAL POINTS TO CONSIDER:

99201-99215-----May only be used once per office visit and require
                documentation of subjective and objective data to
                support the assessment and plan of care.

99213-99215-----This level of care may only be used only 2-3 times
                times per treatment program and then only with
                thorough documentation of a re-examination or
                re-evaluation. This code should not be used
                for a routine office visit.

99201-99205-----May only be billed on initial visit.

97260----------Manipulation codes may be billed at each visit,
                but may not be billed in conjunction with an
                office visit or any other evaluation and
                management code. The A2000 code should only
                be billed when filing for Medicare or C Plus
                patients.

97110-97145-----May be billed each visit, but will be limited to
                two (2) physical therapy codes per visit.

72100-72052-----Radiology codes should be billed once per
                treatment period. If additional codes are
                billed, these services will be subject to
                medical review for documentation of medical
                necessity.

95869----------This code should only be used to file for needle
                EMG's. Certificates from additional training are
                required before reimbursement can be made for this
                code. Surface EMG's are considered a part of the
                global fee for isokinetic testing and are not
                eligible for separate reimbursement.

Chiropractic Manual
Adopted: 4/95
Page 5

## DEFINITION OF CHIROPRACTIC CARE

Chiropractic is the branch of the healing arts which is concerned
with human health and disease processes.  Doctors of Chiropractic
locate and remove, without the use of drugs or surgery, any
interference with the transmission and expression of nerve energy
in the human body by means taught in schools or colleges of
chiropractic which are recognized by the state board of
chiropractic examiners.  These physicians consider man as an
integrated being, but give special attention to spinal mechanics,
musculoskeletal, neurological, vascular, nutritional and
environmental relationships.

## DEFINITION OF PHYSICAL MEDICINE SERVICES

Like chiropractic, physical therapy is a branch of medicine which
is concerned with the treatment of disease or injury by the use of
therapeutic exercise and other interventions that focus on
improving posture locomotion, strength, endurance, balance,
coordination, joint mobility, flexibility, functional activity and
alleviating pain thru the use of physical agents other than drugs.
Physical therapists utilize physical, chemical and other such
properties of heat, light, water, electricity, massage, exercise,
and radiation to increase or return to their highest function, the
muscles and bones in the human body.  Devices which relieve pain
and increase function may also be utilized.

Chiropractic Manual
Adopted: 4/95
Page 6

## QUALIFIED PERSONNEL

Chiropractic and/or physical medicine services are subject to the
same standard contract guidelines with regard to provider
eligibility as are the medical/surgical community.  To be eligible
for reimbursement by Blue Cross Blue Shield of Alabama, the
services filed MUST have been rendered by a duly licensed Doctor
of Medicine (M.D.), Doctor of Dental Surgery (D.D.S.), Doctor of
Medical Dentistry (D.M.D.), Doctor of Osteopathy (D.O.), Doctor of
Chiropractic (D.C.) or Licensed Physical Therapist (L.P.T. or
R.P.T.) or Occupational Therapist (O.T.).  Chiropractic Assistants
(C.A.), Licensed Physical Therapy Assistants (L.P.T.A.), Certified
Occupational Therapy Assistant (C.O.T.A.), Licensed Massage
Therapist (L.M.T.), Exercise Therapist (E.T.), Certified Athletic
Trainer (A.T.C.), Office Managers, Secretaries, insurance staff,
nutritionists, or any other auxiliary personnel are NOT eligible
providers.

Chiropractic Manual
Adopted: 4/95
Page ‾

CODE OF ALABAMA @ 34-24-120 (1993)
Regarding Chiropractic Care


1ST SECTION of Level 1 printed in FULL format.

CODE OF ALABAMA
Copyright (c) 1977-1993 by The State of Alabama
All rights reserved.

*** THIS SECTION IS CURRENT THROUGH THE 1993 SPECIAL SUPPLEMENT ***
*** (1993 FIRST EXTRA SESSION) ***

TITLE 34.  PROFESSIONS AND BUSINESSES
CHAPTER 24.  PHYSICIANS AND OTHER PRACTITIONERS OF HEALING ARTS
ARTICLE 4.  CHIROPRACTORS
DIVISION 1.  GENERAL PROVISIONS

Code of Ala. @ 34-24-120 (1993)

@ 34-24-120.  "Chiropractic" defined; authority of licensed
chiropractor

(a) The term "chiropractic," when used in this article, is hereby
defined as the science and art of locating and removing without the
use of drugs or surgery any interference with the transmission and
expression of nerve energy in the human body by any means or methods
as taught in schools or colleges of chiropractic which are recognized
by the state board of chiropractic examiners.

(b) Any chiropractor who has been certified and licensed by the state
board of chiropractic examiners may examine, analyze and diagnose the
human body and its diseases by the use of any physical, clinical,
thermal or radonic method, and the use of X-ray diagnosing, and may
use any other general method of examination for diagnosis and
analysis taught in any school of chiropractic recognized by the state
board of chiropractic examiners.

(c) Chiropractors certified and licenses by the state board of
chiropractic examiners may practice chiropractic as set forth in
subsections (a) and (b) of this section and may also recommend the
use of foods and concentrates, food extracts, and may apply first aid
and hygiene, but chiropractors are expressly prohibited from
prescribing or administering to any person any drugs included materia
medica, except as herein provided, from performing any surgery, from
practicing obstetrics or from giving X-ray treatments or treatments
involving the use of radioactive materials of any description.

Chiropractic Manual
Adopted: 4/95
Page 8


CODE OF ALABAMA @ 34-24-120 (1993)
Regarding Chiropractic Care (Con't)

HISTORY:  Acts 1959, No. 108, p. 612, @ 1; Acts 1989, No. 89-237, p.
321, @ 2.

NOTES:
CODE COMMISSIONER'S NOTE. --Section 8 of Acts 1989, No. 89-237
provides that the act only applies to conduct occurring after April
6, 1989.  Conduct occurring before this date shall be governed by
preexisting law.
    Acts 1993, No. 93-150, @ 2, provides:  "The existence and
functioning of the State Board of Chiropractic Examiners, created and
functioning pursuant to Sections 34-24-120 to 34-24-145, inclusive,
is continued, and those code sections are expressly preserved."

COLLATERAL REFERENCES.  --70 C.J.S., Physicians & Surgeons, @ 1.
    Scope of practice of chiropractic. 16 ALR4th 58.
    Podiatry or chiropody statutes:  validity, construction, and
application.  45 ALR4th 888.

NOTES APPLICABLE TO ENTIRE TITLE

CROSS REFERENCE. --As to small loan business, see @ 5-18-1 et seq.
As to enjoining unauthorized or unlawful practice of professions,
occupations or callings, see @ 6-6-503.  As to licensing of
businesses, vocation or occupations generally, see @ 40-12-40 et seq.

CITED in Parsons v. State Bd. of Registration, 416 So. 2d 1031 (Ala.
Civ. App. 1982).

NOTES APPLICABLE TO ENTIRE CHAPTER

COLLATERAL REFERENCES. --Liability of doctor, psychiatrist, or
psychologist for failure to take steps to prevent patient's suicide.
17 ALR4th 1128.
    Standard of care owed to patient by medical specialist as
determined by local, "like community," state, national, or other
standards.  18 ALR4th 603.
    Physician's or other healer's conduct, or conviction of offense,
not directly related to medical practice, as ground for disciplinary
action.  34 ALR4th 609.
    Recovery for emotional distress resulting from statement of
medical practitioner or official, allegedly constituting outrageous
conduct.  34 ALR4th 688.
    Valuation of goodwill in medical or dental practice for purposes
of divorce court's property dispersion.  78 ALR4th 853.
    Liability for interference with physician-patient relationship.
87 ALR4th 845.

Chiropractic Manual
Adopted: 4/95
Page 9

SCOPE OF PRACTICE

Chiropractic and physical therapy services can be classified as
the practice of utilizing the relationships between the
musculoskeletal structures of the body, the spinal column and the
nervous system to restore and maintain health. Both disciplines
utilize the physical, chemical and other properties of heat,
light, water, electricity, massage, exercise and radiation to
increase or return to their highest function, the muscles and
bones in the human body. As with any medical discipline, their
care is rendered keeping in mind standards of quality with regard
to first aid, hygiene, nutritional and rehabilitative procedure.

Chiropractic and physical medicine services do not include
invasive treatments such as surgery or the prescribing or
administering of drugs for treatment. With additional and
extended certification, it is permissible, however, for both to
perform such minimally invasive testing as needle
electromyography, when accompanied by other neuromuscular testing.
Both chiropractic and physical therapy offer natural, drugless,
nonsurgical approach to health care. Should their patients
require an invasive form of treatment, the patient must be
referred immediately to the most appropriate medical, surgical,
psychiatric, or other such specialty for care.

Most chiropractors limit their practice to the treatment of
musculoskeletal disorders. While others treat neurogenic or
neurophysiological components of many varied conditions directly
related to body mechanics. Chiropractors should treat only those
areas for which they are licensed by the State of Alabama to
perform and for which their is the preponderance of published
literature which shows acceptable evidence that Chiropractic
intervention is effective. For example, a Chiropractors should
treat diagnoses such as sprain/strain, subluxation and other
chronic or degenerative disorders. Chiropractors without the
afore mentioned extended certification should NOT perform invasive
testing, other than that discussed above, of any kind, prescribe
medications in any form or treat obstetric conditions.

When a physical therapist performs his/her services under the
direct orders of a doctor, they are expected to report back to
that person on a regular basis with progress or lack of progress
reports.

Chiropractic Manual
Adopted: 4/94
Page 10

## PHYSICAL MEDICINE GUIDELINES

For physical therapy services to be considered for coverage as
reasonable and necessary, the following conditions must be met.

1.  The therapy must be performed by a physician or upon a
    physician's order by a licensed, registered physical
    therapist (RPT).

2.  When physician ordered services are rendered, the RPT must
    create a written treatment regimen designed to augment the
    treatment plan of physician.

3.  The therapy must be of a skilled nature and require the
    services of a skilled provider as defined above.

4.  The therapy must not be maintenance in nature.

5.  Services performed must achieve a specific diagnosis-related
    goal.

6.  There must always be a documentable expectation that the
    patient will, in fact, achieve reasonable improvement over a
    predictable period of time for the services to be eligible for
    reimbursement.

Some of the more common types of physical therapy modalities and
procedures include such procedures as:

Hot Packs, Hydrocollator, Infra-red Treatments, and Whirlpool
Baths:

   Although these treatments do not ordinarily require the .
   skills and full attention of a qualified physical therapist,
   in cases where the patient's condition is complicated by
   circulatory deficiency, areas of desensitization, open wounds,
   or other complications these modalities may require the
   skill of a registered physical therapist. If such treatments
   are given as a prerequisite to a skilled physical therapy
   procedure, they are considered part of that modality and not
   separately reimbursable.

Chiropractic Manual
Adopted: 4/94
Page 11

TENS: When TENS therapy is used as an ongoing separate modality,
      it does not require the services of a skilled provider.
      The initial application and evaluation for first time
      users may be medically necessary for a RPT or DC.

Supplies furnished to patients who are receiving physical therapy
services would not be billable since they do not constitute
services which require a qualified physical therapist.  DME and
other such supplies should be filed by the patient under the major
medical portion of their contract.

EVALUATIVE TESTING PERFORMED BY A THERAPIST SHOULD BE BILLED BY
THE THERAPIST AND MAY NOT BE BILLED SEPARATELY BY HIS OR HER
EMPLOYER.

Gait Training:  Evaluation and training provided a patient whose
      ability to walk has been impaired by neurological, muscular,
      or skeletal abnormality would be considered physical therapy
      and may be covered, provided it can reasonably be expected to
      improve the patient's ability to walk.  Exercises to improve
      gait, maintain strength, endurance and assist with walking
      for feeble or unstable conditions do not require the
      skills of a qualified physical therapist and are non-covered.

Ultrasound, Shortwave, and Microwave Diathermy Treatments:

      These modalities require the skills of a qualified physical
      therapist or physician and may be covered if contract
      language and medically necessity criteria are met.

 * The following services do not require the skills of a licensed
   physical therapist and would therefore not be eligible for
   reimbursement.

 1.  Repetitive exercise to improve gait, maintain strength and
     endurance, and assist with walking such as that provided in
     support for feeble or unstable patients;

 2.  Range of motion and passive exercises which are not related
     to restoration of a specific loss of function, but are useful
     in maintaining range of motion in paralyzed extremities;

 3.  General or weighted exercise programs, even then recommended
     by a physician and rendered by a physical therapist.

Chiropractic Manual
Adopted: 4/94
Page 12

TABLE OF COMMON PHYSICAL AGENTS AND THEIR EFFECTS

| PHYSICAL AGENT | PRIMARY EFFECT | SECONDARY EFFECT |
|---|---|---|
| Hot water<br>Hot air<br>Radiant heaters<br>Sun<br>Incandescent lamps<br>Diathermy<br>Microwave | Thermal | Hyperemia<br>Sensory sedation<br>Motor sedation<br>Microorganism alteration |
| Sun<br>Heated metals<br>Carbon arc<br>Mercury vapor arc | Photochemical | Erythema<br>Pigmentation<br>Ergosterol activation |
| Galvanic currents | Electrochemical | Muscle stimulation |
| Low frequency<br>Interrupted current<br>Sinusoidal current<br>Alternating current | Electrokinetic | Muscle stimulation<br>Increased venous flow<br>Increased lymph flow<br>Reflex stimulation |
| Vibration<br>Massage<br>Traction, intermittent<br>Therapeutic exercise | Kinetic | Muscle stimulation<br>Increased venous flow<br>Increased lymph flow<br>Reflex stimulation |
| Cryotherapy | Hypothermal | Sedation<br>Decongestion<br>Ischemia |
| Ultrasound | Mechano-thermal<br>-chemical | Cellular massage<br>Heat<br>Sedation |
| Hydrotherapy<br>(Contrast baths) | Mechano-cryo-<br>thermal | Cellular massage<br>Heat/Cold<br>Sedation<br>Increased venous flow<br>Increased lymph flow |

Chiropractic Manual
Adopted: 4/94
Page 13

## OCCUPATIONAL THERAPY

Occupational therapy, unlike physical therapy, is not a covered benefit in many plans administered by Blue Cross Blue Shield of Alabama contracts.  While physical therapy works with gross motor movement for improved ambulation, mobility and balance, occupational therapy works with fine motor movement such as retraining the fingers to button a shirt, perform activities of daily living or returning to a vocation.  Both disciplines utilize non-invasive, drugless techniques to accomplish their treatment.

Like physical therapy, occupational therapy services would be considered medically necessary only if ordered by a doctor on a patient with a documentable, reasonable expectation of improvement in the patient's condition within a predictable period of time. Unlike physical therapy, occupational therapy is not required to affect improvement when a patient suffers from temporary loss or reduction of function (e.g. temporary weakness associated with rest following major abdominal surgery) which would be expected to improve spontaneously with increased normal activities.

Occupational therapy services should not duplicate physical therapy services.  Occupational therapy would be most appropriate when a specific diagnosis related goal is documented in the patient's care plan which requires fine motor retraining.  For example, occupational therapy services would not be medically necessary if performed for the general treatment of an obtunded patient such as one with Alzheimer's disease.  Occupational therapy services would be appropriate to design, fabricate, and fit an orthotic or "self help" devices, such as hand splints for arthritic patients or teach a new arm amputee how to peel a vegetable with one hand.

Chiropractic Manual
Adopted: 4/95
Page 14

STANDARDS OF DOCUMENTATION

Physical medicine and chiropractic treatments should be documented
by the person rendering the service.  If a treatment is co-signed
by eligible personnel but rendered by non-eligible personnel, it
is not eligible for reimbursement.

Preauthorization
Request:                  A letter requesting that preauthorization
                          be granted on particular treatments, tests
                          or procedures may be forwarded to the
                          Medical Review Manager.  This request
                          should be attached to a complete History
                          and Physical treatment plan and rationale
                          of why this form of treatment should be
                          rendered.

Initial Evaluation:       The purpose of a new patient or initial
                          evaluation is to determine a diagnosis,
                          set up a treatment plan, determine a
                          prognosis, and to refer to another
                          physician, if indicated.

                          Documentation for this initial visit
                          should follow a S.O.A.P. or
                          Subjective/Objective/Assessment/Plan
                          format in that it should clearly present
                          all subjective and objective findings, as
                          well as, a general assessment of the
                          patient's present condition and a plan
                          for future care.  It should include a
                          complete history and physical exam .
                          and a specific orthopedic and neurological
                          examination directed to the area of
                          involvement.  Radiology findings,
                          laboratory test results and secondary
                          electrodiagnostic testing (if clinically
                          indicated) should also be included.

                          If applicable, we should see a plan for
                          home treatment outlined at this time.

Re-evaluations:           If adequate progress cannot be documented
                          by about the 6th visit, a re-evaluation
                          should be performed. This re-evaluation
                          should contain documentation of subjective
                          and objective symptoms, as well as
                          findings during your assessment, previous

Chiropractic Manual
Adopted 4/95
Page 15

modalities and future plans.  It should
focus on the current status of the
patient and the changes, if any, which
have occurred since his/her last
treatment.

If no significant progress has been
documented by the 12th visit, the patient
should be either referred to another
chiropractor, a D.O. or a medical/surgical
physician to be sent for further
development or diagnostic testing.  At
this time a symptomatic patient should be
re-evaluated to define whether their
symptoms are from an exacerbation, a
re-injury or a new diagnosis requiring
a different course of treatment.

Progress Notes:          Treatment notes or progress notes
                         should contain the same information
                         as is outlined above.  They should
                         also focus on the current status of
                         the patient and the changes which
                         have occurred since the last
                         treatment.

Bar scan and other such computer generated notes are often
inadequate when used as a sole source of documentation.  For
services to be reimbursed by Blue Cross Blue Shield of Alabama,
there must be eligible plan benefits, a documentable rationale for
the plan of care ordered and a reasonable expectation that the
treatment provided will produce significant improvement in the
patient's condition in a reasonable and generally predictable
period of time.

Chiropractic Manual
Adopted: 4/95
Page 16

## MAINTENANCE CARE

Maintenance Care is defined as management of a patient who has reached pre-clinical status or maximum medical improvement where the condition is resolved or become stable.  It is characterized by repetitive services which do not require the use of complex and sophisticated procedures and most likely could be performed by a non-clinical person.

Significant changes in a patient's condition, pain level, and/or function should be re-evaluated and continued aggressive care needs documented before reimbursement can be made.  Re-education and reform of home or current treatment should be handled during this re-evaluation.

## CRITERIA FOR DISCHARGE

As indicated above, the patient should be discharged if:

   (1) the patient has achieved maximum medical improvement;

   (2) the patient can be adequately maintained with a home program;

   (3) the patient becomes asymptomatic;

   (4) the patient's symptoms have not responded to treatment;

   (5) the patient has been referred to another physician for care;

   (6) the patient becomes non-compliant or refuses to cooperate with the prescribed treatment plan;

   (7) when the patient's diagnosis falls outside the chiropractic or physical medicine purview.

Chiropractic Manual
Adopted: 4/95
Page 17

## FREQUENCY CF TREATMENT

The frequency with which a patient is treated should be dictated
by the following:

    (1)  the diagnosis being treated,
    (2)  the degree of weakness or injury,
    (3)  the level of pain or spasm, and
    (4)  the amount of skilled intervention required to safely
         treat the patient.

## DURATION OF TREATMENT

The duration of treatment is the time during which it is medically
necessary for a patient to be seen by a doctor or therapist in
order to:

    (1)  diagnose the present condition,
    (2)  set up a treatment plan,
    (3)  treat the patient until stable, and
    (4)  set-up a home program.

Blue Cross and Blue Shield recognizes that both the frequency and
duration of treatment can be affected by one or more of the
following:

    (1) the amount of pre-intervention pain,
    (2) the duration of symptoms,
    (3) the number of previous episodes, and
    (4) the underlying pathology which might complicate treatment
        and diagnosis (lumbarization or facet asymmetry).

Chiropractic Manual
Adopted: 4/95
Page 18

## APPROPRIATE TESTING

Appropriate testing is defined as:

     (1) that which is deemed necessary by the treating
        physician to reach a diagnosis;
     (2) related and appropriate for the diagnosis ordered;
     (3) required to rule out other entities which may resemble
        the working diagnosis;
     (4) that which may be done in an effort to determine whether
        a change in therapeutic approach is in order.

  *THERE SHOULD ALWAYS BE A <u>DOCUMENTED</u> , DISCERNIBLE GOAL TO
  JUSTIFY ANY TEST OR PROCEDURE BEING PERFORMED.

Testing would be considered inappropriate if it:

     (1) merely supports, without necessity, the established
        diagnosis, but will not alter the way in which the
        patient is treated;
     (2) duplicates other tests performed;
     (3) is not clinically relevant to the diagnosis being
        treated;
     (4) would be considered unsuitable or unproven by current
        literature or there has not been a preponderance of
        evidence to substantiate the efficacy thereof.

Documentation sent to Blue Cross and Blue Shield of Alabama for
preauthorization of radiology or other procedures not listed in
Exhibit A must contain the following:

     (1) a complete history and physical;
     (2) definable neuro-muscular abnormalities;
     (3) rationale for objective documentation;
     (4) isokinetic studies and reports, if indicated;
     (5) documented protocols and plan of care;
     (6) plain films, if indicated.

Chiropractic Manual
Adopted: 4/95
Page 19

OFFICE VISIT CODING

Physical therapists are not allowed to use office visit codes for
their services.  Chiropractic office visits are generally coded as
one of the following:

    99201---Office or other outpatient visit for the evaluation
            and management of a new patient, which requires
            these three key components:
                  -a problem focused history;
                  -a problem focused examination;
                  -straightforward medical decision making.
            Physicians typically spend 10 minutes face-to-face
            with the patient and/or family.

    99202---Office or other outpatient visit for the evaluation
            and management of a new patient, which requires
            these three key components:
                  -an expanded problem focused history;
                  -an expanded problem focused examination;
                  -straightforward medical decision making.
            Physicians typically spend 20 minutes face-to-face
            with the patient and/or family.

    99203---Office or other outpatient visit for the evaluation
            and management of a new patient, which requires
            these three key components:
                  -a detailed problem focused history;
                  -a detailed problem focused examination;
                  -medical decision making of low complexity.
            Physicians typically spend 30 minutes face-to-face
            with the patient and/or family.

    99211---Office or other outpatient visit for the evaluation
            and management of an established patient...Typically
            5 minutes are spent performing or supervising.these
            services.

    99212---Office or other outpatient visit for the evaluation
            and management of an established patient, which
            requires at least two of these three key components:
                  -a problem focused history;
                  -a problem focused examination;
                  -straightforward medical decision making.


*OFFICE VISIT CODES MAY NOT BE USED WHEN FILING FOR A
MANIPULATION.  A CHIROPRACTOR MAY NOT FILE FOR AN OFFICE VISIT
AND A MANIPULATION ON THE SAME PATIENT, SAME DAY EVEN IF THE
PATIENT IS BEING SEEN BY THE CHIROPRACTOR FOR THE FIRST TIME.
FILING THESE CODES ON SEPARATE DAYS WHEN THEY WERE ACTUALLY
PERFORMED ON THE SAME DAY IS CONSIDERED FRAGMENTATION OF
SERVICES, ABUSE OF THE PROGRAM AND A SERIOUS QUALITY PROBLEM.

Chiropractic Manual
Adopted: 4/95
Page 20

## RECORDS REQUESTS

If a record has been requested for review and the provider does
not respond to the initial request, a second request may be
generated before denying (951) for lack of medical records.  If,
however, the provider sends medical records which do not
adequately document the services filed, a second request will not
be generated and the inquiry/claim will be denied for lack of
documentation.

## CRITERIA FOR APPROVAL/DENIAL OF COVERAGE

To be approved for coverage, the services filed must be medically
necessary, adequately documented in the medical record, within the
scope of practice for the provider rendering the care and within
the patient's contract limitations.  Likewise, if the medical
record does not reflect the level of service, manner of service
and medical necessity of that service, no reimbursement will be
made.

Reconsiderations can be requested by the provider for previous
denials.  These reconsideration requests must be made in writing
and be accompanied by additional information which the provider
feels documents the medical necessity, adequacy of documentation
or level of care previously denied.

---GLOSSARY---

ABDUCTION - The lateral movement of the limbs away from the
            median plane of body or the lateral bending of
            the head or trunk or the movement of fingers or
            or toes from the axial plane.

ACTIVE CARE - Treatment directed toward returning the patient
            to his or her pre-clinical status.

ACUTE - Sharp, poignant, having a short and relatively severe
        course.

ACUTE EXACERBATION - A sharp or severe aggravation of symptoms or
            an increase in the severity of a symptom or
            condition.

ADDUCTION - Movement of a limb toward the median plan of body,
            or, in case of digits, toward axial line of a limb.

ADJUSTMENT - The skilled method of chiropractic treatment done
            by hand or instrument, directed at specific
            articulations and/or soft tissues.

ANKYLOSIS - Immobility and consolidation of a joint due to
            disease, injury, or surgical procedure.

ARTHRITIS - Inflammation of a joint, usually accompanied by pain,
            swelling and frequently changes in structure.

ARTHROSIS - Any condition of a joint or a joint affliction caused
            by trophic degeneration.

ARTICULATION - A joint; the junction of two or more bones.

ATLANTO-AXIAL/ATLAS-AXIS - Region of the spine pertaining to the
                    first and second cervical segments.

ATLANTO-OCCIPITAL - Region of the spine pertaining to the occiput
                    and first cervical segment.

ATLAS - First cervical segment.

ATROPHY - A wasting away; a diminution in the size of a cell,
          tissue, organ, or part.

AXIS - Second cervical segment.

Chiropractic Manual
Adopted: 4/95
Page 22

CAUSALGIA - A burning pain, often accompanied by trophic skin
            changes, due to injury of a peripheral nerve.

CERVICAL - Neck; refers to the first seven vertebrae of the spine.

CHRONIC - Persisting over a period of time.

CLINICAL - Founded on actual observation and treatment of patient
           as distinguished from data or facts obtained by
           experimentation or pathology.

COMPLEX SUBLUXATION - A complex phenomenon that has or may
                      have, biomechanical, pathophysiological,
                      clinical, radiologic, and other
                      manifestations.  Subluxation complexes
                      are of clinical significance as they are
                      affected by or evoke abnormal physiological
                      responses in neuro-musculoskeletal
                      structures and/or other body systems.

COMPLICATION - An added difficulty; a complex state.  A
               disease or accident superimposed upon another
               without being specifically related, yet
               affecting or modifying the prognosis of the
               original disease.

CONGENITAL - Present at birth.

CREPITUS - A crackling that can be heard or palpated or both
           when a joint is moved through its range of motion.

"C" CURVE - The normal cervical lordosis.

CURE - Course of treatment which results in a complete
       restoration of health.                          •

DEGENERATIVE - That which is caused by the deterioration of
               tissues, bones and organs.

DIAGNOSIS - The art or act of determining the nature of a
            disease.

DISCOGENIC - Caused by derangement of an intervertebral disc.

Chiropractic Manual
Adopted: 4/95
Page 23

DISCOPATHY - Disease of an intervertebral disc; traumatic
        discopathy-rupture of an intervertebral disc due
        to physical trauma.

DISEASE - A pathologic condition of the body which presents a
        group of symptoms peculiar to it and which sets it
        apart as an abnormal entity different from normal
        body states.

DORSAL - Refers to mid-back; see thoracic.

DYSARTHROSIS - Deformity or malformation of a joint.

DYSFUNCTION - Any abnormality or impairment of function.

DYSKINESIA - Impairment of the power of voluntary movement,
        resulting in fragmentary or incomplete movements.

DYSPNEA - Shortness of breath or difficulty in breathing.

EBURNATION - An increase in the density of bone.

EDEMA - Soft tissue swelling  that is the result of abnormal
        accumulation of fluid.

EFFUSION - Refers to increased joint fluid.

EMPIRIC - Based on observation and experience rather than
        having a scientific basis.

EXACERBATION - Aggregation of symptoms or an increase in the
        severity of a condition.

EXOSTOSIS - A benign bony growth projecting outward from the
        surface of a bone, characteristically capped by
        cartilage.

EXTENSION - The movement by which both ends of any part are
        pulled apart. A movement that brings the members
        of a limb onto or toward a straight position.
        Opposite of flexion.

Chiropractic Manual
Adopted: 4/95
Page 24

EXTREMITY - Lower extremity; hip, thigh, leg, ankle and foot.
            Upper extremity; shoulder, arm, forearm, wrist and
            hand.

FIBROSIS - The formation of fibrous tissue; fibroid or fibrous
           degeneration.

FIBROSITIS - Inflammation hyperplasia of the white fibrous
             tissue of body, especially of the muscle sheaths
             and fascial layers of the locomotor system; it is
             marked by pain and stiffness; called also
             fibrofascitis and muscular rheumatism.

FLEXION - The act of bending or condition of being bent in
          contrast to extension.

FUNCTIONAL - Of or pertaining to a function; affecting the
             functions, but not the structure; said of
             disturbances of function with no organic cause.

GENU VALGUS - Knock knee.

GENU VARUS - Bowleg.

GIBBUS - A markedly exaggerated localized kyphosis (hunchback
         deformity).

GONIOMETER - A protractor with moveable arms used to measure
             range of motion.

HYPERESTHESIA - Excessive sensitivity of the skin or special
                senses.

HYPERMOBILITY - Excess joint relaxation that permits increased
                mobility.

HYPOESTHESIA - Decrease in tactile sensation.

HYPOMOBILITY - Abnormally decreased movement.

INTERVERTEBRAL DISC - Layers of fibrocartilage between the
                      bodies of adjacent vertebrae, consisting
                      of a fibrous ring enclosing a pulpy
                      center.

Chiropractic Manual
Adopted: 4/95
Page 25

INTERVERTEBRAL FORAMEN - The passage formed by the inferior and
                        superior notches on the pedicles of
                        adjacent vertebrae; it transmits a
                        spinal nerve and vessels.

KINESIOLOGY - The study of muscles and muscular movement.

KYPHOSIS - Abnormally increased convexity in the curvature of
           the thoracic spine as viewed from the side; hunchback.

LATERAL FLEXION - Side bending.

LOCALIZED PAIN - Confined to the area of injury.

LORDOSIS - The anterior concavity of the curvature of the
           lumbar and cervical spine as viewed from the
           side.  The term is used to refer to abnormally
           increased curvature (hollow back, saddle back,
           sway back) and to the normal curvature (normal
           lordosis).

MAINTENANCE CARE - Any repetitive activity which can most
                   often be done by a non-skilled person
                   and only seeks to prevent disease.

MANIPULATION - The use of hands in skillful manner.

MILITARY NECK - Loss of the normal cervical lordosis.

MODALITY - Treatment performed by a doctor or therapist which
           employs a therapeutic agent.

MOTOR UNIT - Comprising two adjacent vertebrae, its disc, and
             related components.

MUSCULAR SPLINTING - Severe muscle spasm.

MYALGIA - Pain in a muscle or muscles.

MYODYSNEURIA - Paraspinal and/or general musculature symptom
               complex (pain, muscle spasm, etc.).

MYOFASCITIS - Inflammation of a muscle and its fascia,
              particularly of the fascial insertion of muscle
              to bone.

MYOSITIS - Inflammation of a voluntary muscle.

MYOSPASH - Muscle spasm.

Chiropractic Manual
Adopted: 4/95
Page 26

NEURALGIA - Paroxysmal pain which extends along the course of
              one or more nerves. Many varieties of neuralgia
              are distinguished according to the part affected
              or to the cause, as brachial, sciatic, etc. or
              anemic, diabetic, gouty, etc.

NEURITIS - Inflammation of a nerve, a condition attended by
              pain and tenderness over the nerves, anesthesia
              and paresthesias, paralysis, wasting, and
              disappearance of the reflexes. In practice, the
              term is also used to denote non-inflammatory lesions
              of the peripheral nervous system.

NEUROGENIC - Forming nervous tissue, or stimulating nervous
              energy; originating in the nervous system.

NEUROPATHY - A general term denoting functional disturbances
              and/or pathological changes in the peripheral
              nervous system. The term is also used to designate
              non-inflammatory lesions in the peripheral nervous
              system.

NUCLEUS PULPOSUS - The gelatinous mass of fine white and elastic
              fibers that form the central portion of an
              intervertebral disc.

ORTHOPEDICS - That branch of medical science that deals with
              prevention or correction of disorders involving
              the locomotor structures of the body, esp. the
              skeleton, joints, muscles and fascia.

OSSEOUS - Relating to bones.

OSTEOARTHRITIS - Degenerative joint disease occurring chiefly
              in older persons, characterized by degeneration
              of the articular cartilage, hypertrophy of bone
              at the margins, and changes in the synovial
              membrane. It is accompanied by pain and
              stiffness, particularly after prolonged activity.
              Called also degenerative arthritis, hypertrophic
              arthritis and degenerative joint disease.

OSTEOARTHROSIS - Chronic arthritis of non-inflammatory character.

OSTEOPHYTE - A bony outgrowth, also known as a spur.

OSTEOPOROSIS - Abnormal rarefaction of bone, seen most commonly
              in the elderly. Depending on the extent of
              demineralization of bone, it may be accompanied
              by pain, particularly of the lower back;
              deformities, such as loss of stature; and
              pathological fractures. It may be idiopathic or
              secondary to other diseases.

Chiropractic Manual
Adopted: 4/95
Page 27

PARALYSIS - Temporary suspension or permanent loss of function;
especially loss of sensation or voluntary movement.

PARAVERTEBRAL - Occurring or situated near the spinal column.

PARESIS - Weakness of incomplete paralysis.

PARESTHESIA - Morbid or perverted sensation; an abnormal
sensation, as burning, prickling, formication,
etc.

PHYSIOLOGY - The science that deals with the functions of
living organisms.

PREVENTIVE CARE - Any activity which seeks to prevent disease,
prolong life, and promote health.

RADICULALGIA - Pain due to disease of the spinal nerve roots.

RADICULAR PAIN - Pain resulting from nerve root irritation.

RADICULITIS - Inflammation of the roots of spinal nerves.

RADICULONEURITIS - Acute febrile polyneuritis.

RADICULONEUROPATHY - Disease of the nerve roots and nerve.

RADICULOPATHY - Disease of the nerve roots.

RAMROD SPINE - Marked restriction of movement of the spine.

REFERRED PAIN - Pain felt at areas distant to the site of injury.

REHABILITATIVE CARE - Care directed toward the restoration of
optimal strength and flexibility of the
musculoskeletal system and allows for
optimum nerve function.

RESIDUAL PAIN - Pain which persists for months or years after
an injury; may be the end result of fibrous
or scar tissue formation or in a joint as
post-traumatic arthrosis.

ROTATION - The process of turning around an axis.

Chiropractic Manual
Adopted: 4/95
Page 28

SCOLIOSIS - An appreciable lateral deviation in the normally
          straight vertical line of the spine.

SIMPLE SUBLUXATION - An alteration of the normal dynamics,
                  anatomical or physiological relationships
                  of contiguous articulations.

SOFT TISSUE - Body tissue other than bone, e.g., muscles,
          ligaments, nerves, blood vessels, etc.

SOMATIC - Pertaining to structures of the body wall, e.g.,
        skeletal muscles.

SPINA BIFIDA - A developmental anomaly characterized by
            defective closure of the bony encasement of
            the spinal cord, through which the cord and
            meninges may (s. bifida cystica) or may not
            (s. bifida occulta) protrude.

SPINA BIFIDA OCCULTA - Spina bifida in which there is a defect
                    of the bony spinal canal without
                    protrusion of the cord or meninges.

SPONDYLOLISTHESIS - Forward displacement of one vertebra over
                 another, usually of the fifth lumbar over
                 the body of the sacrum, or of the fourth
                 lumbar over the fifth, due to fracture/
                 separation of the pars interarticularis.

SPONDYLOLYSIS - A fracture or separation of the pars
             interarticularis of a lumbar vertebra without
             forward displacement.

SPONDYLOSIS - Ankylosis of a vertebral joint; also a general
           term for degenerative changes due to osteoarthritis.

SPRAIN - A joint injury in which some of the fibers of a
       supporting ligament are ruptured but the continuity
       of the ligament remains intact.

STRAIN - An overstretching or overexertion of some part of the
       musculature.

SUBACUTE - Disease in which symptoms are less pronounced but
         more prolonged than in an acute disease; intermediate
         between acute and chronic disease.

SUPPORTIVE CARE - Care directed toward maintaining the stability
                of a patient's condition.

Chiropractic Manual
Adopted: 4/95
Page 29

THORACIC - Pertaining to the thorax, Mid-back, chest.

TINNITUS - A sensation of whistling or ringing in the ears.

TORTICOLLIS - Lateral deviation of the head and neck.

TRACTION SPURS - Osteophytes formed on anterior portion
                 of vertebral body.

TREATMENT - Any specific procedure used for the cure or
            amelioration of a disease or pathological
            condition.

TROPISM - A growth response in a motile organism, elicited
          by an external stimulus.

VALGUS DEFORMITY - Deviation away from the midline.

VARUS DEFORMITY - Deviation toward the midline.

VERTEBRA - Any of the thirty-three bones of the spinal column,
           comprising the seven cervical, twelve thoracic,
           five lumbar, five sacral, and four coccygeal
           vertebrae.

VERTIGO - Sensation of dizziness, inability to maintain
          equilibrium, or both.

VISCERAL - Pertaining to viscera (internal organs).

## NON-COVERED SERVICES STATEMENT

As my patient, I want to provide you with the best care possible.
There are services which I feel are necessary for the treatment of
your condition and maintenance of good health that are not covered
by your health benefits contract. You will be expected to pay for
those services in full. Let me reassure you that I will order
only the tests and treatments which I feel are necessary for your
treatment and care.

If you have any questions about whether or not a particular
service is covered by your health benefits contract, someone in
our office will be happy to assist you. Thank you for your
understanding.

| PATIENT SIGNATURE | DATE | POSSIBLY NON-COVERED SERVICES & MONIES DUE |
|---|---|---|
| * _____ | _____ | _____ |
| * _____ | _____ | _____ |
| * _____ | _____ | _____ |
| * _____ | _____ | _____ |
| * _____ | _____ | _____ |
| * _____ | _____ | _____ |
| * _____ | _____ | _____ |

*  I have read your policy and agree to pay for the services
   outlined above which are not covered by my contract as
   indicated by my signature for each date above.