# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

DR. JONATHAN GRIFFITHS, et al., )
)
)
Plaintiffs, )
)                    CV 01-BU-0471-S
v. )
)
BLUE CROSS AND BLUE )
SHIELD OF ALABAMA, )
)
Defendant. )

**ENTERED**

JUN 1 5 2001

---

## Memorandum Opinion

---

In the above-styled action, filed February 22, 2001, Plaintiffs, a group of chiropractors and their clinics,[1] seek damages and injunctive relief based on allegations that Defendant Blue Cross and Blue Shield of Alabama ("Blue Cross") has violated §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2; Alabama antitrust law, § 8-10-1, et seq., Ala. Code (2000); Alabama fraud law, and has intentionally and tortiously interfered with business relationships. Now before the Court is Blue

---

[1]Plaintiffs are: Dr. Jonathan Griffiths; Griffiths Chiropractic Care, P.C.; Dr. J. Matthew Youngblood; Youngblood Chiropractic, P.C.; Dr. Ronald F. Ivie; Ivie Chiropractic Clinic; Dr. Robert Hollis, Jr.; J. Robert Hollis, Jr., D.C., P.C.; Dr. M. Burton Anderson; Anderson Chiropractic Clinic; Dr. Jody S. Gray; Gray Chiropractic Center; Dr. Peter DeFranco; Hueytown Chiropractic Clinic, L.L.C.; Dr. Carl Nelson; Nelson Chiropractic Clinic; Dr. Kevin Palmer; Palmer Chiropractic Clinic; Dr. Jerry Kirby; and Kirby Chiropractic Clinic. Hereinafter, these parties will be referred to collectively as "Plaintiffs."

*33*

Cross's motion, filed March 29, 2001, to dismiss all claims pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 17). The parties have briefed the motion, which is now ripe for decision. After carefully considering the complaint and the arguments of counsel, the Court concludes that Blue Cross's motion to dismiss is due to be GRANTED IN PART AND DENIED IN PART.

## I. BACKGROUND[2]

In their 28-page complaint, Plaintiffs allege the following: Chiropractic is a licensed health care profession in Alabama, as it is in every other state. Id. at ¶ 37. Under Alabama law, chiropractic is defined as "the science and art of locating and removing without the use of drugs or surgery any interference with the transmission and expression of nerve energy in the human body by any means or methods as taught in schools of chiropractic . . . ." Id. (quoting § 34-24-120(a), Ala. Code 1975). As licensed chiropractors in Alabama, Plaintiffs are permitted to examine, analyze and diagnose the human body and its diseases by the use of any physical, clinical, thermal or radonic method, and the use of X-ray diagnosing, and may use any other general method of examination for diagnosis and analysis taught in recognized schools of chiropractic. Id. (citing § 34-24-120(b)).[3]

Defendant Blue Cross is a non-profit, special purpose corporation.

---

[2]The facts and circumstances set forth in the "Background" section of this memorandum are based on the allegations of Plaintiffs' complaint. Particular allegations may or may not actually be true.

[3]Licensed chiropractors may also lawfully recommend the use of foods and concentrates, food extracts, and may apply first aid and hygiene. § 34-24-120(c). However, chiropractors are expressly prohibited from otherwise prescribing or administering to any person any drugs included in materia medica, from performing any surgery, from practicing obstetrics or from giving X-ray treatments or treatments involving the use of radioactive materials of any description. Id.

Complaint at ¶25. It is organized under § 10-4-100 et seq. of the Alabama Code to maintain and operate a healthcare service plan for its subscribers. Id.[4]  With subscribers in Alabama numbering in the millions, Blue Cross is reported to provide and/or administer healthcare benefit plans for over 70% of Alabama's insured residents. Id. at ¶ 38.

## A.    THE PARTICIPATING CHIROPRACTOR PROGRAM

As a component of its business of providing and/or administering medical health benefits plans, Blue Cross contracts with numerous health care providers, including Plaintiffs and other chiropractors, to provide health care services to Blue Cross plan subscribers. Id. at ¶38. In particular, Blue Cross has contracted with Plaintiffs in connection with its Participating Chiropractors Program ("PCP"). Complaint at ¶43. Blue Cross initially developed the PCP in 1995 for use in connection with the self-funded plan for employees of the State of Alabama, administered by Blue Cross (the "State Employees' Plan"). Id. at ¶ 41.  Under the State Employees' Plan subscribers were offered a package of chiropractic benefits that included an 18-visit, medical necessity review point with no annual limits, no deductible, and a specific co-pay provision. Id. In hopes of attracting chiropractors to join the PCP, Blue Cross representatives advised certain chiropractors, including Plaintiffs Drs. Jonathan Griffiths and Jerry Kirby, that if the State Employees Plan actually received a reduction of overall benefits paid to PCP chiropractors after one year, then Blue Cross would aggressively market the benefits package in the State Employees' Plan to other employer groups. Id. Blue Cross representatives further

---

[4]For additional background on Blue Cross's status as a special purpose corporation, see Blue Cross and Blue Shield of Alabama v. Protective Life Ins. Co., 527 So.2d 125 (Ala. Civ. App. 1987).

assured Plaintiffs Griffiths and Kirby, among others, that if and when the PCP were extended to other employer groups, Blue Cross would offer the same chiropractic benefits package in those plans as was offered in the State Employees' Plan. Id. Plaintiffs Griffiths and Kirby, believed and repeated these representations to their fellow chiropractors around the state and encouraged them to join the PCP. Id. Ultimately, Plaintiffs claim they were all induced to join the PCP based upon the representations that Blue Cross would attempt to extend the chiropractic benefits package from the State Employees' Plan to other employer groups serviced by Blue Cross if the PCP resulted in a reduction of the amount of overall chiropractic benefits paid. Complaint at ¶43.

In 1996, approximately one year after the PCP with the State Employees' Plan began, Plaintiffs Griffiths and Kirby, among others, met with representatives of both the State Employees' Plan and Blue Cross. Complaint at ¶ 42. It was reported at that time that the State Employees' Plan had enjoyed a 12% to 14% cost reduction in overall chiropractic payments over the one year period since the PCP began. Id. Although Blue Cross had represented that such savings would cause it to aggressively market the State Employees' Plan chiropractic benefits package to other employer groups, Blue Cross failed to do so. Id. at ¶43. Instead, Blue Cross began aggressively marketing health benefit plans that offered chiropractic benefits that were dramatically lower. Id. Blue Cross still continues to push upon employer groups plans with severely reduced chiropractic benefits, such as limits with a $200 to $400 annual benefit limit with a $200 deductible, or group benefit plans with no chiropractic benefits at all. Id. Indeed, Blue Cross, Plaintiffs assert, will not expand chiropractic coverage even if asked to do so by an employer group. Id.

Pursuant to the Participating Chiropractor Agreement governing the relationship between Plaintiffs and Blue Cross (the "Agreement"), participating chiropractor are paid on a fee-for-service basis for medically necessary services that are appropriate to the needs of Blue Cross plan members for chiropractic care. Id. at ¶ 39. The Agreement also requires participating chiropractors to accept as reimbursement a fixed amount set by Blue Cross, or a chiropractor's usual charge, whichever is less, as full payment for their services rendered. Id. at ¶45. See also Participating Chiropractor Agreement, Part VI. Plaintiffs claim that Blue Cross has exploited this power to impose "predatory and punitively low reimbursements, or no reimbursements at all, for the services of doctors of chiropractic." Id.

## B.   BLUE CROSS AND HEALTHSOUTH

Plaintiffs also claim that Blue Cross and HealthSouth Corporation ("HealthSouth") have entered into an anti-competitive agreement that operates to the detriment of Plaintiffs. See Complaint at ¶¶ 26, 52. HealthSouth is the leading provider of physical therapy services in Alabama and the country. Id. at ¶¶ 26, 27. Alleging that many of the services provided by chiropractors are allegedly the same or comparable to those offered by physical therapists,[5] Plaintiffs suggest that HealthSouth is a competitor of theirs in the market to provide health care services in Alabama. See id. at ¶¶44, 46. Plaintiffs claim that HealthSouth also happens to

---

[5]Alabama law defines physical therapy as the "treatment of a human being by the use of exercise, massage, heat, cold, water, radiant energy, electricity or sound for the purpose of correcting or alleviating any physical or mental condition or preventing the development of any physical or mental disability, or the performance of neuromuscular-skeletal tests and measurements to determine the existence and extent of body malfunction." § 34-24-191(a)(1), Ala. Code (2001). Physical therapy may be practiced only upon the referral of a licensed physician or dentist, and it may not include radiology or electrosurgery. Id. Physical therapists, like chiropractors, must be licensed in order to practice in Alabama. § 34-24-210.

be one of Blue Cross's largest single customers, by virtue of Blue Cross's having previously served as the administrator for, and now the insurer of, the benefit plan that HealthSouth has for its own employees in many parts of the country. Id. at ¶28. Blue Cross also allegedly receives fees from HealthSouth as a result of having been designated by the Health Care Financing Administration to serve as the nationwide Medicare Fiscal Intermediary for HealthSouth, at HealthSouth's request.[6] Id. at ¶ 27.

Plaintiffs allege that in return for "substantial payments" that Blue Cross receives from HealthSouth based on the relationships described above, Blue Cross has agreed to use its strength in the health care insurance market in Alabama to direct Blue Cross subscribers' business away from chiropractors and towards other health care providers that offer comparable services, particularly those like HealthSouth who offer hospital-based physical therapy. Complaint at ¶¶ 29, 46. Plaintiffs suggest that Blue Cross has done so by allegedly establishing substantially more restrictive benefit limits, higher deductibles, lower reimbursement rates, and more burdensome pre-certification requirements for chiropractic procedures under its health benefit plans than it does for comparable services offered by physical therapists and other health care providers. See id. at ¶ 1, 44-47, 49-50. Plaintiffs contend that Blue Cross has further disfavored chiropractors by allegedly entirely

---

[6]The Health Care Financing Administration, a part of the Department of Health and Human Services, administers the Medicare program, under which the federal government provides health insurance for elderly and disabled persons. Under 42 U.S.C. § 1395h(a), the Secretary of Health and Human Services can contract with public or private agencies or organizations to serve as fiscal intermediaries in administering Medicare. See United States v. Blue Cross and Blue Shield of Alabama, Inc., 156 F.3d 1098, 1100 n.3 (11th Cir. 1998); United States v. Calhoon, 97 F.3d 518, 522 (11th Cir. 1996).

eliminating coverage for certain services afforded by chiropractors while maintaining coverage for comparable services provided by physical therapists and by allegedly wrongfully refusing to reimburse chiropractors for covered diagnostic testing and services they perform. Id.

## C.    THE CHIROPRACTIC LIAISON COMMITTEE

Plaintiffs contend that in response to the many complaints raised by chiropractors, Blue Cross formed the Chiropractic Liaison Committee (the "Committee") in approximately 1995, comprising it of representatives from both Blue Cross and practicing chiropractors. Complaint at ¶48. Plaintiffs claim that, at the time the Committee was formed and thereafter, Blue Cross representatives made statements indicating that the avowed purpose of the Committee was to improve relations between chiropractors participating in the PCP and Blue Cross and to effectuate change in the conduct of Blue Cross toward chiropractors. Id. Plaintiffs say that in reliance upon these representations, they embraced the Committee as an indication of Blue Cross's good faith and believed that the Committee would be the best vehicle for resolving their grievances with Blue Cross. Id. Plaintiffs contend, however, that various Blue Cross representatives connected with the Committee agreed among themselves at the time the Committee was formed that it would have no real force or effect. Plaintiffs thus claim that from its inception, the Committee was, unbeknownst to them, merely a "sham," designed to deceive and "nominally appease" chiropractors dissatisfied with Blue Cross. Id. at ¶¶ 48, 77.

## D.    THE PLAINTIFFS' CLAIMS

In Counts I and II of their complaint, Plaintiffs seek damages and injunctive

relief against Blue Cross under the Clayton Act, 15 U.S.C. § 12 et seq., to remedy alleged violations of the federal antitrust laws, specifically sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.  In Count III, Plaintiffs bring claims pursuant to § 6-5-60, Ala. Code 1975, to remedy alleged violations of the Alabama state antitrust laws, §§ 8-10-1 et seq.  Counts IV, V, and VI assert various fraud claims under Alabama law, based upon alleged misrepresentations by Blue Cross concerning the chiropractic benefits that would be available to subscribers in connection with the PCP, the chiropractic benefits packages included in the plans Blue Cross markets to employer groups, and concerning the Chiropractic Liaison Committee.  Finally, in Count VII Plaintiffs allege that Blue Cross has tortiously and intentionally interfered with the business relationships that Plaintiffs have with their patients who are Blue Cross subscribers.

## II.  REVIEW STANDARDS

Defendants have filed a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6). A complaint may be dismissed under Rule 12(b)(6) only when, accepting all of the allegations of the complaint as true and giving Plaintiff the benefit of every reasonable inference that may be drawn therefrom, it appears beyond doubt that the plaintiff can prove no set of facts in support of his allegations which would entitle him to relief.  White v. Lemacks, 183 F.3d 1253, 1255 (11th Cir. 1999); Long v. Satz, 181 F.3d 1275, 1278 (11th Cir. 1999).  This rule applies with no less force to a Sherman Act claim.  McLain v. Real Estate Bd. of New Orleans, Inc., 444 U.S. 232, 246 (1980).

The sufficiency of a complaint is measured by Fed. R. Civ. P. 8(a), which

requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." The Federal Rules thus "do not require a claimant to set out in detail the facts upon which he bases his claim," <u>Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit</u>, 507 U.S. 163, 168, (1993) (quotations and citations omitted), as a complaint need only " 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.' " <u>Quality Foods v. Latin Am. Agribusiness Dev. Corp.</u>, 711 F.2d 989, 995 (11th Cir. 1983) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)). Such notice pleading is all that is required for a valid antitrust complaint. <u>Municipal Utilities Bd. of Albertville v. Alabama Power Co.</u>, 934 F.2d 1493, 1501 (11th Cir. 1991). However, a plaintiff must plead sufficient facts so that each element of an alleged antitrust violation can be identified, <u>Seagood Trading Corp. v. Jerrico, Inc.</u>, 924 F.2d 1555, 1576 (11th Cir. 1991), and it is not proper to assume that the plaintiff can prove facts that he has not alleged or that a defendant has violated the antitrust laws in ways that have not been alleged. <u>Associated General Contractors of California, Inc. v. California State Council of Carpenters</u>, 459 U.S. 519, 526 (1983). Keeping these standards in mind, the Court turns to Blue Cross's arguments in support of its motion.

## III. DISCUSSION

### A. Section 1 of the Sherman Act

In Count I, Plaintiffs have alleged a violation of Section 1 of the Sherman Act (hereinafter "Section 1 "), which declares illegal "[e]very contract, combination . . ., or conspiracy, in restraint of trade or commerce among the several States." 15

U.S.C. § 1.[7]  There are three essential elements of a Section 1 violation: (1) joint or concerted action between more than one party that (2) unreasonably restrains trade in (3) interstate commerce.  American Ad Management, Inc. v. GTE Corp., 92 F.3d 781, 784 (9th Cir. 1996); R.D. Imports Ryno Industries, Inc. v. Mazda Distributors (Gulf), Inc., 807 F.2d 1222, 1224 (5th Cir. 1987).  In addition, even if a plaintiff has alleged sufficient facts comprising a Sherman Act violation, in order to recover damages or injunctive relief therefor under the Clayton Act, a complaint must also allege an actual or threatened "antitrust injury" to Plaintiffs.  Todorov v. DCH Healthcare Authority, 921 F.2d 1438, 1452 (11th Cir. 1991).  That is, in order to recover damages under section 4 of the Clayton Act, 15 U.S.C. § 15,[8] it must appear that Plaintiffs have suffered an " 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful,' " MCA Television Ltd. v. Public Interest Corp., 171 F.3d 1265, 1279 (11th Cir. 1999) (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)),

---

[7]The full text of Section 1 provides as follows:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 1.

[8]15 U.S.C. § 15(a) provides in pertinent part as follows:
[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

or that such injury is threatened to Plaintiffs, so as to allow an award of injunctive relief under section 16 of the Clayton Act, 15 U.S.C. § 26.[9] <u>Todorov</u>, <u>supra</u>.

     1.  Unreasonable Restraint of Trade

     Blue Cross first contends that Plaintiffs' Section 1 claims are due to be dismissed because Plaintiffs' antitrust allegations amount to nothing more than charges that Blue Cross uses its market power to force chiropractors to accept what Plaintiffs deem unreasonably low fees for their services.  The Court agrees with Blue Cross that Plaintiffs' Sherman Act claims do appear to be based, at least in part, on such allegations.  The Court also agrees with Blue Cross that insofar as Plaintiffs are making such claims, they are not viable under Section 1 of the Sherman Act.  It is well established that an insurer such as Blue Cross, who in effect purchases health care services on behalf of its subscribers, does not violate Section 1 by using its market power to negotiate even sharply discounted fees that healthcare providers agree to accept as full payment for services.  See, <u>e.g.,</u> <u>Levine v. Central Florida Medical Affiliates, Inc.</u>, 72 F.3d 1538, 1548 (11th Cir. 1996); <u>Austin v. Blue Cross and Blue Shield of Alabama</u>, 903 F.2d 1385, 1390-91 (11th Cir. 1990); <u>Zinser v. Rose</u>, 868 F.2d 938, 940-41 (7th Cir. 1989); <u>Brillhart v. Mutual Medical Insurance, Inc.</u>, 768 F.2d 196, 200-01 (7th Cir. 1985); <u>Kartell v. Blue Shield of Mass, Inc.</u>, 749 F.2d 922, 925-30 (1st Cir. 1984); <u>Travelers Ins. Co. v. Blue Cross</u>

---

[9]15 U.S.C. § 26 provides in pertinent part as follows:

     Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity . . . .

of Western Pennsylvania, 481 F.2d 80, 84 (3rd Cir. 1973).

However, the Court cannot agree with Blue Cross that the foregoing proposition and supporting caselaw are enough to dispose of the issue of whether Plaintiffs' allegations state a claim under section 1 of the Sherman Act. Blue Cross asserts that Plaintiffs' federal antitrust claims are based merely on allegations that chiropractors are not paid enough money for treating Blue Cross subscribers. But Plaintiffs have claimed more than just that. Under a fair reading of the complaint, Plaintiffs additionally maintain that Blue Cross, pursuant to an agreement with one of Plaintiffs' competitors, i.e., HealthSouth, has created an insurance framework that discriminates against chiropractors and favors other healthcare providers who offer comparable services, physical therapists in particular, and thereby places economic pressure upon Blue Cross subscribers to choose non-chiropractic care. That is, Plaintiffs assert that Blue Cross has engaged in a concerted refusal to deal with chiropractors on substantially equal terms with other health care providers, which has forced chiropractors to compete on unfavorable terms: the millions[10] of Blue Cross subscribers in Alabama who experience health problems for which they might seek care from either a chiropractor or a physical therapist, for example, are

---

[10]Plaintiffs allege that Blue Cross provides or administers health benefit plans for 70% of Alabama's insured residents and that this translates to "millions" of subscribers within the State. Complaint ¶ 38. Drawing a reasonable inference from this allegation, one could find that Blue Cross has at least two million subscribers in the State. There is ample reason to believe that such is not at all an exaggeration. See http://www.bcbsal.org/bcbs_about_faq.html (Blue Cross states on its website that it provides coverage for "more than 2.8 million people in Alabama");(Blue Cross admitted in 1997 that its plans covered approximately 2.2 million Alabama residents). If so, it would mean that Blue Cross plans cover approximately half of Alabama's population. See Blue Cross and Blue Shield of Alabama, Inc. v. Nielsen, 116 F.3d 1406, 1408 & n.2,3 (11th Cir. 1997); http://www.census.gov (Alabama's total population according to data from the 2000 Census: 4,447,100).

purportedly faced with being saddled with significantly greater out-of-pocket expenses if they opt for chiropractic care, as a result of Blue Cross's allegedly unjustifiably more limited coverage for chiropractic procedures, lower benefit limits, lower reimbursement rates, and higher deductibles regarding such care.

In its brief, Blue Cross never truly confronts this aspect of Plaintiff's complaint. However, a number of appellate decisions have held that concerted action giving rise to an insurer's policies that favor one class of state-licensed healthcare provider over another to the detriment of competition may constitute an unreasonable restraint of trade in violation of Section 1. See Ballard v. Blue Shield of Southern West Virginia, Inc., 543 F.2d 1075 (4th Cir. 1976) (reversing a district court's dismissal on the pleadings where a group of chiropractors alleged that a number of corporations selling Blue Cross-Blue Shield health insurance, the doctor-directors of such corporations, and the West Virginia State Medical Association had, in violation of Section 1, combined and conspired to refuse health insurance coverage for chiropractic services, while claims for similar physician's services were honored); Virginia Academy of Clinical Psychologists v. Blue Shield of Virginia, 624 F.2d 476 (4th Cir. 1980) (holding that the refusal of defendants Blue Shield of Virginia and Blue Shield of Southwestern Virginia to pay for services rendered by clinical psychologists unless such services were billed through a physician, while allowing competing psychiatrists to bill directly, was an unreasonable restraint of trade that violated Section 1); Hahn v. Oregon Physicians' Service, 868 F.2d 1022 (9th Cir. 1988) (reversing summary judgment in favor of a defendant health care plan controlled by physicians, where plaintiff podiatrists claimed that they were being forced to compete on unequal terms with medical

doctors and doctors of osteopathic medicine in the Portland, Oregon market for foot care; podiatrists were excluded from becoming members of the plan, meaning they were reimbursed for their services at 60% of a fixed rate, while member physicians were reimbursed at 90% of the same rate).  To the extent that Plaintiffs have alleged that Blue Cross has, pursuant to an agreement with HealthSouth, established policies that make chiropractic care substantially less economically attractive to its millions of subscribers than comparable services offered by physical therapists and other health care providers, the Court rejects Blue Cross's argument that Plaintiffs' complaint does not assert any conduct that might be deemed an unreasonable restraint of trade cognizable under Section 1 of the Sherman Act.  See id.; Virginia Pharmacy; Hahn, supra.  See also Battle v. Liberty Nat'l Life Ins. Co., 493 F.2d 39, 44-45 (5th Cir. 1974)[11] (averments sufficient to state a claim for unreasonable restraint of trade under Section 1 where defendant insurance company with dominant share of Alabama burial insurance market allegedly conspired with its wholly-owned defendant subsidiary that contracted with the great majority of independent funeral homes in Alabama to supply funeral merchandise and services; burial policies specified that benefits would be significantly greater if an insured chose an "authorized" funeral home, i.e., one that had contracted with the subsidiary).  Cf. Blue Shield of Virginia v. McCready, 457 U.S. 465 (1982) (holding that a health-plan subscriber had sufficiently alleged antitrust injury as a result of the plan's purposeful scheme to reduce competition for psychotherapeutic services by reimbursing subscribers for services provided by psychiatrists but not for

---

[11]All decisions of the United States Court of Appeals for the Fifth Circuit handed down prior to the close of business on September 30, 1981 are binding precedent in the Eleventh Circuit.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

services provided by psychologists unless billed through a physician).

    2.  Defining the Relevant Market

Blue Cross also contends that Plaintiffs' claims under Section 1 are due to be dismissed because Plaintiffs' allegations do not adequately define the relevant market.  Plaintiffs allege that the "[r]elevant [product] markets affected by Blue Cross's conduct are (i) the market for the provision of reimbursement for private medical health services; and (ii) the market for chiropractic services. . . . The relevant geographic market for purposes of this action is the State of Alabama." Complaint ¶ 36.  Blue Cross contends that Plaintiffs' proposed product market is simply "too conclusory" and fails to account for the reasonable interchangeability of products and services.  In addition, Blue Cross asserts that Plaintiffs' use of the State of Alabama as the proposed geographic market is undone by supposedly contradictory allegations that this lawsuit involves interstate commerce.

As a threshold matter, the Court would note that, contrary to Blue Cross's suggestion, it is not always essential that a plaintiff precisely define the relevant market in order to prevail on a Section 1 claim.[12]  First, there are some limited types of concerted activity that are so anticompetitive on their face that they are deemed unlawful per se, which makes it unnecessary to conduct an examination of the relevant market.  See Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 9

---

[12]Blue Cross is correct, however, that a plaintiff bringing a monopolization claim under Section 2 of the Sherman Act must define and prove the relevant market.  See U.S. Anchor Mfg., Inc. v. Rule Indus., Inc., 7 F.3d 986, 994 (11th Cir. 1993) ("Defining the market is a necessary step in any analysis of market power and thus an indispensable element in the consideration of any monopolization or attempt case arising under section 2") (quoted in Smith v. Network Solutions, Inc., 135 F.Supp. 2d 1159, 1168 (N.D. Ala. 2001)).  However, the Court is at this point concerned only with the viability of Plaintiffs' Section 1 claims alleging unlawful restraint of trade.

(1984) (noting that where a per se restraint is found, the very "character of the restraint produced by such an arrangement is considered a sufficient basis for presuming unreasonableness without the necessity of any analysis of the market context in which the arrangement may be found"); Southtrust Corp. v. Plus System, Inc., 913 F.Supp. 1517, 1523 (N.D. Ala. 1995) ("A finding of per se illegality under the antitrust laws avoids the necessity of an investigation into the nature and history of the industry involved and a definition of the relevant market"). Second, even where a given practice challenged as violative of Section 1 is subjected to the more flexible "rule of reason" analysis,[13] if a plaintiff is able to prove actual anticompetitive effects have resulted, then such may obviate or abbreviate any inquiry into the contours of the relevant market and a defendant's power therein. See Indiana Fed'n of Dentists, 476 U.S. at 460-61; Levine, 72 F.3d 1551-52; William C. Holmes, Antitrust Law Handbook § 2:10 (2001 ed.).

It might be assumed that the rule of reason, rather than a per se rule of illegality, would be applied to Plaintiffs' Section 1 claims. See Virginia Academy, 624 F.2d at 484-85 (applying the rule of reason, and expressly declining to adopt a per se rule of illegality, to medical plans refusal or conditioning payments to psychologists); Hahn, 868 F.2d at 1030-32 (same, where plan controlled by physicians refused to deal with podiatrists on equal terms with other providers). Thus, there is at least a reasonable possibility that Plaintiffs would have a burden at trial to define and prove the relevant market. See, e.g., Levine, 72 F.3d at 1552.

---

[13]Under the rule of reason, "the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." State Oil Co. v. Khan, 522 U.S. 3, 10 (1997).

The Court would further acknowledge that Plaintiffs' attempt to define expressly the relevant product market is not a paradigm of antitrust pleading. Plaintiffs may be literally accurate that a market "affected" by Blue Cross's allegedly unlawful conduct is that "for chiropractic services." But an antitrust market must include products or services that are reasonably interchangeable. See Smith v. Network Solutions, Inc., 135 F.Supp. 2d 1159, 1167-68 (N.D. Ala. 2001). Thus, a proper product market definition would more broadly include practical alternatives offered by competitors of chiropractors as well. See Levine, 72 F.3d at 1552-53; Hahn, 868 F.2d at 1030 (suggesting that the relevant market for purposes of podiatrists' Section 1 claim against a physician-controlled health care plan was the "Portland foot care market")[14]; Virginia Academy, 624 F.2d at 485 (recognizing that psychiatrists and psychologists are both state-licensed and compete in a portion of the health care market for psychotherapy).

Nonetheless, the Court concludes that it would be improper to dismiss under Fed. R. Civ. P. 12(b)(6) Plaintiffs' Section 1 claims based upon perceived imperfections in Plaintiffs' proposed market definition. First, as explained above, it is not a necessary element of every Section 1 claim that a plaintiff plead and prove the relevant market, even where the rule of reason may be applicable. Second, even in cases in which the relevant market must be shown, such is essentially a question of fact, T. Harris Young & Associates, Inc. v. Marquette Electronics, Inc., 931 F.2d 816, 823 (11th Cir. 1991), which may be properly developed and refined through the discovery process. See Alan's of Atlanta, Inc. v. Minolta Corp., 903

---

[14]The Hahn court appeared to accept the plaintiffs' identification of Portland as the proper geographic market for antitrust analysis. 868 F.2d at 1024 n.1.

F.2d 1414, 1429 n.26 (11th Cir. 1990). See also Foundation for Interior Design Educ. Research v. Savannah College of Art & Design, 244 F.3d 521, 531 (6th Cir. 2001) ("Market definition is a highly fact-based analysis that generally requires discovery"); Double D Spotting Service, Inc. v. Supervalu, Inc., 136 F.3d 554, 560 (8th Cir. 1998) ("Most often, 'proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers.' ") (quoting Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 436 (3rd Cir. 1997)). In any event, the Court finds that the allegations of Plaintiffs' complaint at least implicitly acknowledge that the relevant product market includes not only the services of chiropractors, but also the oft-referenced "comparable" or "similar" services afforded by other types of competing health care providers that Plaintiffs claim are allegedly preferred by Blue Cross. The Court finds that these allegations relating to the relevant product market are sufficient to put Blue Cross on notice of the nature of Plaintiffs' Section 1 claim. This is all that is required, as there is no heightened pleading standard for antitrust claims.

Blue Cross also takes issue with Plaintiffs' specification of the State of Alabama as the proposed geographic market for their antitrust claims.   In particular, Blue Cross contends that Plaintiffs' delineation of an intrastate relevant market is in "irreconcilable conflict" with other allegations in the complaint indicating that interstate commerce is involved in the case.  Plaintiffs have indeed alleged that Blue Cross, an Alabama corporation, has used its power within one Alabama market, i.e., for the provision and administration of health care benefit plans, to restrain trade within another Alabama market, i.e., the health care market in which chiropractors compete with other state-licensed healthcare providers.

Plaintiffs have also specified, as Blue Cross claims, a number of ways in which interstate commerce is allegedly affected by virtue of Blue Cross's restraint. See Complaint ¶¶ 30-35. However, the Court concludes that such allegations are not contradictory and are sufficient to withstand a motion to dismiss.

"It is well established that a local restraint on intrastate commerce may nevertheless substantially and adversely affect interstate commerce and thus violate Section 1 of the Sherman Act." United States v. Cadillac Overall Supply Co., 568 F.2d 1078, 1085 (5th Cir. 1978) (citing Hospital Building Co. v. Trustees of Rex Hospital, 425 U.S. 738 (1976)). See also McLain v. Real Estate Bd. of New Orleans, Inc., 444 U.S. 232, 242 (1980); Chatham Condominium Associations v. Century Village, Inc., 597 F.2d 1002, 1006 (5th Cir. 1979). What Plaintiffs have alleged here is an at-least-primarily intrastate commercial restraint that substantially affects interstate commerce. The Court finds that such is sufficient to sustain federal jurisdiction under the Sherman Act. See Ballard, 543 F.2d at 1077-78 (holding that the district court erred for dismissing for lack of subject matter jurisdiction over a Section 1 claim, reasoning, "It is possible that the alleged reduction or elimination of the chiropractors business throughout the entire State of West Virginia may adversely affect interstate commerce"). See also Summit Health, Ltd. v. Pinhas, 500 U.S. 322, 329-333 (1991). The Court also finds that Plaintiff's proposed geographic market is sufficiently defined to withstand a motion to dismiss, even if it is ultimately shown that the healthcare market in question is not actually restricted tightly within the borders of Alabama. See Battle, 493 F.2d at 45-46 ("[I]t is plain that the defendants' activities, the sale of burial insurance and the performance of their obligations under these policies, basically are within the geographic confines

of the State of Alabama. Although there might be some limited excursions outside of the territorial boundaries of the state in performing the obligations under the insurance contracts, the perimeters of the 'exact spot' of a relevant market need not be outlined [in order to survive a motion to dismiss]").

Blue Cross urges that there is not a per se rule against dismissing Sherman Act claims for failure to define properly the relevant market in the complaint. That is true. However, none of the cases cited by Blue Cross support the dismissal of Plaintiffs' Section 1 claims based upon Plaintiffs' proposed market definition. Many of the cases Blue Cross cites concern claims brought under Section 2 of the Sherman Act, under which a plaintiff is required to plead and prove the defendant's power in the relevant market as an element of the claim, unlike Section 1. See, e.g., U.S. Anchor Mfg., Inc. v. Rule Industries, Inc., 7 F.3d 986 (11th Cir. 1993); American Key Corp. v. Cole National Corp., 762 F.2d 1569, 1579 (11th Cir. 1985); Morgenstern v. Wilson, 29 F.3d 1291, 1296 (8th Cir. 1995). Many are also distinguishable because they fall into the category of cases where it is obvious that a plaintiff cannot proceed on his Sherman Act claims as stated because his proposed market is drawn in an unduly narrow manner in order to artificially inflate the defendant's power in the relevant market. See, e.g., Queen City Pizza, 124 F.3d at 436 (affirming dismissal of plaintiff's complaint alleging a Section 2 claim where plaintiff's alleged market, for "ingredients, supplies, materials, and distribution services used by and in the operation of Domino's pizza stores," was too narrow because it failed to account for reasonable interchangeability of products); Double D Spotting Service, 136 F.3d at 560 (affirming dismissal where plaintiff's proposed market, "for unloading services at the Supervalu, Inc. warehouse in Urbandale,

Iowa," was too narrow geographically); <u>Elliott v. United Center</u>, 126 F.3d 1003, 1004-05 (7th Cir. 1997) (affirming the dismissal where plaintiff alleged that defendant had a monopoly in the market for "food concessions" at a particular professional sports arena in Chicago); <u>TV Communications Network, Inc. v. Turner Network Television, Inc.</u>, 964 F.2d 1022, 1025 (10th Cir. 1992) (proposed relevant market consisting of one specific television station was too narrow to state a viable antitrust claim). The Court finds that such is simply not the case here. Based on the foregoing, the Court concludes that Blue Cross's motion to dismiss is due to be denied insofar as it pertains to Plaintiffs' claims under Section 1 of the Sherman Act.

## B. Section 2 of the Sherman Act

In Count II, Plaintiffs have alleged a violation of Section 2 of the Sherman Act (hereinafter "Section 2"), which prohibits monopolization of, or attempts or conspiracies to monopolize, "any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.[15] Plaintiffs claim that Blue Cross has either monopolized or attempted to monopolize the market for health care reimbursement services in the State of Alabama. Complaint ¶ 58. "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of

---

[15]The full text of Section 2 provides as follows:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 2.

monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Levine, 72 F.3d at 1555.   "To establish a violation of section 2 for attempted monopolization, 'a plaintiff must show (1) an intent to bring about a monopoly and (2) a dangerous probability of success.' " Id.   As with their Section 1 claims, Plaintiffs' allegations must suggest that Plaintiffs have either suffered actual antitrust injury in order to be entitled to damages or that they are threatened with antitrust injury so as to be entitled to injunctive relief for a violation of Section 2.  See Todorov, 921 F.2d at 1446.

> In support of their Section 2 claims, Plaintiffs allege as follows:

> Blue Cross, with it monopolistic market strength, has (i) severely curtailed or altogether eliminated reimbursement for services provided by plaintiffs to insured patients; (ii) directed persons covered by medical health benefits plans offered or administered by Blue Cross away from Doctors of Chiropractic; (iii) unilaterally, arbitrarily, and capriciously determined which fully recognized and accepted procedures it will cover and which procedures it will not; (iv) unconscionably imposed conditions for covered chiropractic treatment that are incompatible with accepted chiropractic practices; and (v) utilized pre-certification requirements to deny benefits for medically necessary treatment provided to patients even in emergency situations when pre-certification is neither feasible nor possible due to the conduct of Blue Cross.

Complaint ¶ 60.

It would appear that in regard to their Section 2 claims, like their Section 1 claims, Plaintiffs are again asserting that Blue Cross has utilized its power in the Alabama health care reimbursement market to coerce Plaintiffs and other

chiropractors to accept low fixed prices as compensation for services rendered to Blue Cross subscribers. However, Blue Cross's alleged use of market power to obtain discounts for its customers from health care providers does not constitute willful acquisition or maintenance of monopoly power for purposes of a Section 2 claim. See Austin, 903 F.2d at 1390; Kartell, 749 F.2d at 931; Travelers, 481 F.2d at 84. Therefore, Plaintiffs allegations on this particular score fair no better when brought under Section 2 than when brought under Section 1. As the Court has already explained, however, Plaintiffs' complaint does more than simply allege that Blue Cross uses its leverage in the insurance market to impose low fees upon health care providers including Plaintiffs. So the question remains whether Plaintiffs' complaint otherwise states a Section 2 claim. The Court concludes that it does not.

Plaintiffs Section 2 claims boil down to allegations that Blue Cross has attained or attempted to acquire monopoly power as an insurer and has used that power to Plaintiffs' detriment by dealing with chiropractors on unfavorable terms, both in the abstract and relative to competing health care providers, especially physical therapists. However, as an initial matter the Court notes that the mere possession of monopoly power[16] is not in and of itself violative of the Sherman Act. Mid-Texas Communications Systems, Inc. v. American Tel. and Tel. Co., 615 F.2d 1372, 1387 (5th Cir. 1980). Further, " '[a] unilateral refusal to deal is [generally] not unlawful.' " Mr. Furniture Warehouse, Inc. v. Barclays American/Commercial Inc., 919 F.2d 1517, 1522 (11th Cir. 1990) (quoting Malcolm v. Marathon Oil Co., 642 F.2d 845, 860 (5th Cir.), cert. denied, 454 U.S. 1125 (1981) (brackets in Mr.

---

[16]Monopoly power is commonly defined as the power to "control prices or exclude competition" within the relevant market. United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 391 (1956).

Furniture Warehouse)).  As the Supreme Court long ago recognized, "In the absence of any purpose to create or maintain a monopoly, [Section 2] does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal . . . ."  United States v. Colgate, 250 U.S. 300, 307 (1919).  Thus, even if Blue Cross monopolizes the Alabama insurance market and independently determined that it was not going to extend coverage to any chiropractic care, such would not, standing alone, constitute a violation of Section 2.  Rather, Plaintiffs would additionally have to show that Blue Cross so refused to deal with chiropractors with the intent to "create or maintain a monopoly."  Colgate, supra; see also Lorain Journal Co. v. United States, 342 U.S. 143, 155 (1951); Tidmore Oil Co., Inc. v. BP Oil Company/Gulf Products Div., a Div. of BP Oil Co., 932 F.2d 1384, 1389 n.3 (11th Cir. 1991) ("Section 2 proscribes a unilateral refusal to deal when accompanied by the intent to monopolize and the requisite degree of monopoly power")(internal quotation marks omitted); Mr. Furniture Warehouse, 919 F.2d at 1522 ("A monopolist's refusal to deal becomes actionable under the antitrust laws only where the refusal is designed to have an anticompetitive effect, whether to gain greater market share, to drive up prices, or to obtain some other illegal goal"); Six Twenty-Nine Productions, Inc. v. Rollins Telecasting, Inc., 365 F.2d 478, 482 (5th Cir. 1966) ("Section 2 of the Sherman Act prohibits an enterprise from refusing to deal with another business entity when this course of action is undertaken in furtherance of monopolization of the relevant market").

It might be assumed that Blue Cross has attempted to acquire or even actually achieved monopoly power within the relevant Alabama insurance market as

defined by Plaintiffs. Nonetheless, it is plain that nothing Plaintiffs claim that Blue Cross has done to chiropractors could be perceived as an attempt to create, preserve, or extend its alleged monopoly in the relevant market, as required to establish a Section 2 claim. Plaintiffs do not assert that they are actual or potential competitors with Blue Cross in the allegedly monopolized Alabama health care insurance market. Nor do Plaintiffs suggest either that Blue Cross is an actual or potential competitor in the health care provision market in which Plaintiffs and other chiropractors compete or that such market is in jeopardy of being monopolized by anyone. The Court can discern nothing in Blue Cross's alleged unfavorable treatment of chiropractors that could possibly be seen as excluding competition in the relevant market. See <u>Addino v. Genesee Valley Medical Care, Inc.</u>, 593 F.Supp. 892, 901 (W.D. N.Y. 1984) (holding that a plaintiff-podiatrist failed to state a claim in averring that an insurer with alleged monopoly power refused to deal with podiatrists unless they accept "arbitrarily" reduced reimbursement rates because the complaint failed to provide any logical link between the insurer's reduction of podiatric reimbursement rates and the insurer's retention or enhancement of its market power). As Professor Areeda has stated, "It requires a long stretch to call an individual refusal to deal 'monopolizing' when it does nothing to increase the refuser's monopoly power and nothing to increase his position in any market." P. Areeda, <u>Antitrust Law</u> ¶ 736, at 274 (1978) (quoted in <u>Mr. Furniture Warehouse</u>, 919 F.2d at 1523). See also <u>Interface Group, Inc. v. Massachusetts Port Authority</u>, 816 F.2d 9, 12 (1st Cir. 1987) (where then-Judge Breyer recognized in a case involving an airport's refusal to grant favorable terms of access to an airline: "[I]t is difficult to see how denying a facility to one who, like

Interface, is not an actual or potential competitor could enhance or reinforce the monopolist's market power."). Indeed, it would appear that to the extent that Blue Cross has unilaterally limited the availability of benefits for chiropractic care, such would appear to create an opportunity for a competitor to increase its share of the Alabama insurance market by providing more comprehensive chiropractic coverage. See Kenneth L. Glazer, Abbot B. Lipsky, Jr., <u>Unilateral Refusals to Deal Under Section 2 of the Sherman Act</u>, 63 Antitrust L.J. 749, 783-84 (Spring, 1995). The Court concludes that Blue Cross's motion is due to be granted to the extent it seeks the dismissal of Plaintiffs' claims under Section 2 of the Sherman Act.

## C. The State Law Antitrust Claims

Based upon the same allegations underlying their federal law antitrust causes of action, Plaintiffs bring claims in Count III pursuant to § 6-5-60,[17] Ala. Code 1975, to redress alleged violations of Alabama's antitrust laws, § 8-10-1 through § 8-10-3,[18]

---

[17]Section 6-5-60, Ala. Code 1975, provides in pertinent part:
　　　(a) Any person, firm, or corporation injured or damaged by an unlawful trust, combine or monopoly, or its effect, direct or indirect, may, in each instance of such injury or damage, recover the sum of $500 and all actual damages from any person, firm, or corporation creating, operating, aiding, or abetting such trust, combine, or monopoly and may commence the action therefor against any one or more of the parties to the trust, combine, or monopoly, or their attorneys, officers, or agents, who aid or abet such trust, combine, or monopoly.

[18]Section 8-10-1, Ala. Code 1975, provides:
　　　Any person or corporation who engages or agrees with other persons or corporations or enters, directly or indirectly, into any combination, pool, trust, or confederation to regulate or fix the price of any article or commodity to be sold or produced within this state or any person or corporation who enters into, becomes a member of or party to any pool agreement, combination, or confederation to fix or limit the quantity of any article or commodity to be produced, manufactured, mined, or sold in this state must be fined, on conviction, not less than $500 nor more than $2,000.

Section 8-10-2 provides:

Ala. Code 1975.  As a federal court sitting in diversity, this Court is required to apply Alabama substantive law to Plaintiffs' state law claims.  Allison v. Vintage Sports Plaques, 136 F.3d 1443, 1445 (11th Cir. 1998).  However, the federal law relating to monopolization governs Alabama antitrust actions.  McCluney v. Zap Professional Photography, Inc., 663 So. 2d 922, 926 (Ala. 1995) (citing Ex parte Rice, 259 Ala. 570, 67 So.2d 825 (1953)).  Thus, to the extent that the Court has determined that the complaint fails to state a claim for monopolization or attempted monopolization under the Sherman Act, Plaintiffs' allegations are likewise deficient for purposes of pursuing parallel claims under Alabama law.  See City of Tuscaloosa v. Harcros Chemicals, Inc., 158 F.3d 548, 555 n.8 (11th Cir. 1998).  However, Blue Cross has argued that Plaintiffs may not maintain any of their state law antitrust claims, including those alleging a combination in restraint of trade.  The reason, according to Blue Cross, is that Alabama's antitrust statutes have been interpreted as regulating only intrastate commerce while Plaintiffs' complaint alleges an interstate conspiracy and restraint of trade.

---

Any corporation chartered under the laws of this state or any officer, stockholder, agent, or employee of any such corporation which enters into any combination with any other corporation or person with the intent to place the management or control of any such corporation in the hands of another corporation or person and thereby limit or fix the price, restrict or diminish the production, manufacture, sale, use, or consumption of any article of commerce must be fined, on conviction, not less than $500 nor more than $2,000.

Section 8-10-3 provides:
Any person or corporation, domestic or foreign, which shall restrain, or attempt to restrain, the freedom of trade or production, or which shall monopolize, or attempt to monopolize, the production, control, or sale of any commodity or the prosecution, management, or control of any kind, class, or description of business or which shall destroy, or attempt to destroy, competition in the manufacture or sale of a commodity shall be guilty of a misdemeanor and, upon conviction, shall be fined not less than $500 nor more than $2,000 for each offense.

In a pair of nearly identical opinions released the same day, the Alabama Supreme Court has offered significant insight into the character of commerce that may be regulated under Alabama's antitrust laws.  In <u>Abbott Laboratories v. Durrett</u>, 746 So. 2d 316 (Ala. 1999) (hereinafter "<u>Abbott Labs</u>"), the plaintiffs, owners of independent drug stores in Alabama, claimed that a number of drug manufactures, drug wholesalers, HMO's, and mail-order companies had engaged in a conspiracy to control the price of brand-name prescription drugs shipped into Alabama.  In <u>Archer Daniels Midland Co. v. Seven Up Bottling Co. of Jasper, Inc.</u>, 746 So. 2d 966 (Ala. 1999) (hereinafter "<u>ADM</u>"), an Alabama soft drink bottler similarly claimed that three foreign corporate defendants conspired to control the price of citric acid shipped into Alabama.  In each case, a trial court had declined to dismiss the action based on the pleadings.  The Alabama Supreme Court, however, granted the defendants' respective requests to hear interlocutory appeals to decide whether a cause of action existed under § 6-5-60 for a violation of Alabama's antitrust laws based on allegations that there was an agreement to control the price of goods shipped in interstate commerce.  <u>Abbott Labs</u> at 317; <u>ADM</u> at 967-68.  The court first established the premise that the type of commercial transactions regulated by Alabama's antitrust laws was fixed according to the original intent of the legislature that enacted them in 1891 and did not depend upon whether subsequent changes in federal law might have allowed for their more liberal reach.  <u>Id.</u> at 318-322; <u>ADM</u> at 968-972.  The court then attempted to divine that original intent through an exhaustive examination of the state of the law at the time the legislature enacted Alabama's antitrust laws, the history surrounding the codification of the act that forms the basis of current § 8-10-1 through § 8-10-3, and

early appellate state court decisions interpreting the scope of Alabama's antitrust laws. Id. at 322-337; ADM at 973-987. After conducting that inquiry, the court concluded that it had to be presumed that the enacting legislature would have understood that "it did not have the power to directly regulate transactions involving interstate commerce." Id. at 338; ADM at 988. Accordingly, the court ruled that, since Alabama's antitrust laws have the same field of operation now as when first enacted, "§6-5-60 does not provide a cause of action for damages allegedly resulting from an agreement to control the price of goods shipped in interstate commerce." Id. at 339; ADM at 989. However, the court was also careful to note that there could be circumstances where coverage of federal and Alabama state antitrust laws would be concurrent. The court acknowledged that while United States Supreme Court decisions had since the 1890's greatly expanded the reach of Congress's power under Article I of the Constitution to regulate interstate commerce, and the reach of federal antitrust laws along with it, such did not mean that Alabama's antitrust laws govern only the extremely limited commercial activity that might fall outside the ambit of Congress's regulatory authority. Instead, the court held, Alabama's antitrust statutes "regulate monopolistic activities that occur 'within this state'–within the geographic boundaries of this state–even if such activities fall within the scope of the Commerce Clause of the Constitution of the United States." Id. at 339; ADM at 989-90. Therefore, the court explained, "the [Alabama antitrust] statutes . . . may yet have a field of operation because they continue to reach transactions within this state, in the geographic sense, even though such transactions may affect interstate commerce as currently defined by federal law." Id. at 337 n.5; ADM at 988 n.5.

Blue Cross maintains that <u>Abbott Labs</u> and <u>ADM</u> compel the dismissal of Plaintiffs' claims alleging a restraint of trade in violation of Alabama antitrust law because, Blue Cross argues, the alleged conspiracy with HealthSouth underlying Plaintiffs' such claims is " 'interstate' by any definition."   Echoing its prior argument that Plaintiffs have made contradictory interstate and intrastate allegations with regard to their proposed geographic market, Blue Cross points to assertions in the complaint that this case involves interstate commerce to show that Plaintiff's claims are necessarily outside the range of intrastate transactions governed by Alabama's antitrust laws.   Plaintiffs respond by arguing that their complaint limits its allegations to intrastate commerce so as to permit them to proceed on a claim under the Alabama antitrust laws, notwithstanding that such intrastate activities admittedly have the requisite affect on interstate commerce to invoke the jurisdiction of the Sherman Act.

<u>Abbott Labs</u> and <u>ADM</u> are certainly instructive on the reach of Alabama's antitrust laws.   However, the Court finds those cases have potentially distinguishable facts and thus do not truly dictate a result here.   <u>Abbott Labs</u> and <u>ADM</u>, as well as the additional as-of-yet unpublished "no opinion" case cited by Blue Cross, <u>Freeman v. Dupont Pharmaceuticals Co.</u> (No. 1990295), 2001 WL 29257 (Ala. Jan. 12, 2001), each involve claims of restraint of trade in a market for particular goods that were manufactured in another state and traveled in interstate commerce before arriving in Alabama.   In the instant case, by contrast, Plaintiffs have alleged a restraint upon competition in a market for the delivery of health care services that might, at least potentially, be rendered wholly within Alabama and which would be subject to reimbursement from a company organized and located

within Alabama: Blue Cross.  The Court must acknowledge that it is not clear from the face of the complaint whether Plaintiffs are claiming that Blue Cross's policies that allegedly discriminate against chiropractors apply beyond the geographic boundaries of Alabama.  Plaintiffs, who are all located in Alabama, are certainly emphasizing the consequences felt within the state.  But even if the predominant impact is felt in Alabama, it would seem that under Abbott Labs and ADM, if the restraint itself can be characterized as crossing state borders, then it would be outside the regulation of the Alabama antitrust statutes.

Blue Cross claims in its reply brief that Plaintiffs have alleged a "nationwide conspiracy with HealthSouth" (emphasis original).  The Court finds, however, that such mischaracterizes the complaint.  What Plaintiffs have actually claimed is that Blue Cross is the "nationwide Medicare Fiscal Intermediary for HealthSouth," Complaint ¶ 27, and that "Blue Cross is now the insurer for all of HealthSouth's employee health insurance policies nationwide."  Id. at ¶ 28.  Neither the fact that Blue Cross and HealthSouth may operate in other states nor that the relationship between Blue Cross and HealthSouth is alleged to have aspects that extends beyond the territorial limits of Alabama necessarily precludes the possibility that they have entered into an agreement to restrain competition in a market restricted to Alabama.  In an attempt to establish that Plaintiffs' claim is necessarily interstate in scope, Blue Cross also highlights that Plaintiffs have alleged that the market for health insurance is national, that Blue Cross operates beyond the boundaries of Alabama,[19] that Plaintiffs and other providers contracting with Blue Cross treat out-

---

[19]As indicated in text above, it is not clear solely from the complaint whether Blue Cross's allegedly discriminatory policies relating to chiropractors apply to any chiropractic services rendered out of state.

of-state patients,[20] and that goods and services relating to the provision of health care services flow in interstate commerce. However, all of these merely suggest that interstate commerce is affected by the alleged restraint, not that the restraint itself reaches outside Alabama.

The Court finds that Plaintiffs' allegations are at least susceptible to an interpretation that Blue Cross's allegedly discriminatory policies complained of apply only to chiropractors and other health care service providers within the geographic confines of Alabama. While the Court has serious doubts that such is actually the case, if true, this would, the Court concludes, permit Plaintiffs to maintain their claims under the Alabama antitrust statutes, even if there might ultimately be some extraterritorial effect from the alleged restraint. Cf. Dothan Oil Mill Co. v. Espy, 220 Ala. 605, 610, 127 So. 178, 182 (1930) (holding that the Alabama antitrust laws reached an alleged price-fixing conspiracy regarding the sale of cotton-seed throughout the State, notwithstanding that products manufactured from such seed later traveled in interstate commerce). Given the restrictive standards governing dismissals under Fed. R. Civ. P 12(b)(6), the Court concludes that Blue Cross's motion is due to be denied insofar as it pertains to Plaintiffs' state law antitrust claims alleging a conspiracy in restraint of trade. However, because the Court has found that Plaintiffs' complaint does not state a monopolization or attempted monopolization claim under Section 2 of the Sherman Act, Blue Cross's motion to dismiss is due to be granted to the extent it pertains to parallel state law claims, which are governed by the same standards.

---

[20]It is similarly unclear from the complaint whether any of these out-of-state patients are covered by a Blue Cross plan.

### D.  The State Law Fraud Claims

Counts IV, V, and VI assert fraud claims under Alabama law based upon various alleged promises and/or misrepresentations made by Blue Cross personnel. Blue Cross contends that each of these claims is due to be dismissed because they were filed more than two years after the Plaintiffs did or should have discovered the alleged fraud. See § 6-5-38, Ala. Code 1975; <u>Foremost Insurance Co. v. Parham</u>, 693 So.2d 409 (Ala. 1997).  A motion to dismiss under Fed. R. Civ. P. 12(b)(6) based upon the statute of limitations may be granted, however, only where it is apparent upon the face of the complaint that the action is untimely.  <u>AVCO Corp. v. Precision Air Parts, Inc.</u>, 676 F.2d 494, 495 (11th Cir. 1982).

It would appear likely that these claims may indeed be ripe for dismissal at the summary judgment stage based upon the statute of limitations and perhaps other grounds as well.  However, the Court agrees with Plaintiffs that it is not possible to discern, solely from the allegations of the complaint, that the fraud claims of all Plaintiffs are necessarily time barred.  While Blue Cross urges that the complaint alleges that certain events occurred at particular times relatively long ago, such does not necessarily establish with legal certainty when a particular Plaintiff may have known or should have known they took place.  Therefore, Blue Cross's motion to dismiss will be denied as it pertains to Plaintiffs' fraud claims.

### E.  The State Law Claims for Interference With Business Relationships

Plaintiffs claim in Count VII that Blue Cross, through its policies restricting the availability of benefits for chiropractic care, has interfered with the business relationships between Plaintiffs and their patients covered by Blue Cross plans. Blue Cross has again argued that these claims are due to be dismissed for failure to

state a claim upon which relief can be granted based upon the expiration of the two-year limitations period. Plaintiffs have offered no argument in opposition. In addition, the Court concludes that even if the Plaintiffs could somehow overcome the statute of limitations, Plaintiffs cannot maintain these claims. The Alabama Supreme Court has recently stated that a health care provider cannot prevail on a claim alleging that a health insurer tortiously interfered with the contractual relationships between the provider and his patient covered by the insurer where the insurer is considered to be party to such relationship by virtue of the interdependent contracts between the provider and the patient and the insurer. See Ex parte Blue Cross and Blue Shield of Alabama, 773 So. 2d 475, 480 (Ala. 2000). Moreover, to the extent that Plaintiffs are alleging that Blue Cross has harmed their relationships with patients by restricting the availability of benefits for chiropractic care, such does not state a claim. Even a wholesale refusal to deal does not constitute tortious interference with a business or contractual relation under Alabama law. See Axelroth v. Health Partners of Alabama, Inc., 720 So. 2d 880, 886 (Ala. 1998). These claims are due to be dismissed.

## IV. CONCLUSION

Based on the foregoing, Blue Cross's motion to dismiss under Fed. R. Civ. P. 12(b)(6) is due to be GRANTED IN PART AND DENIED IN PART. It is due to be GRANTED insofar as it pertains to Plaintiffs' claims alleging violations of Section 2 of the Sherman Act, Plaintiffs' parallel monopolization and attempted monopolization claims under Alabama antitrust law, and Plaintiff's intentional interference with business relations claims. Such claims will be dismissed. However, Blue Cross's motion is due to be DENIED in all other respects.

Accordingly, following the Court's resolution of Blue Cross's motion to dismiss, the following claims will remain viable:

(1)    the Section 1 Sherman Act claims alleging a conspiracy with HealthSouth to restrain trade;

(2)    claims brought under Alabama antitrust law besides those alleging monopolization or attempted monopolization;

(3)    the fraud claims brought under Alabama law.

A separate order will be entered.

**IT IS SO ORDERED**, this 15th day of June, 2001.


H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE